THE STATE OF KANSAS, *ex rel.* W. R. Stubbs as Governor, etc., *Plaintiff*, v. JOHN S. DAWSON, *as Attorney-general, etc., Defendant.*

No. 17,754.

SYLLABUS BY THE COURT.

1. CONSTITUTIONAL LAW—*Governor—Supreme Executive Power.* The provision of article 1 of the constitution which vests the supreme executive power in the governor implies that the governor is the highest in authority in the executive department, with such power as will secure a faithful execution of the laws in the manner and by the methods prescribed by the constitution and statutes enacted in harmony with that instrument.

2. ——— *Attorney-general—Duties—Statute Mandatory.* The statute making it the duty of the attorney-general, when required by the governor, to appear for the state and prosecute

The State, *ex rel.*, v. Dawson.

in any court or before any officer, in any cause or matter, civil or criminal, in which the state may be a party or interested, is mandatory.

3. PROHIBITORY LAW—*Examination of Witnesses—Authority of Governor.* A proceeding for the examination of witnesses under the provisions of the prohibitory law (Gen. Stat. 1909, § 4366) is a matter before an officer in which the state is interested, and when required by the governor the attorney-general has no discretion to refuse to prosecute in such a proceeding.

4. ——— *Same.* In such a proceeding as that referred to in the above paragraph, and in the situation shown by the facts in this case, it is within the authority of the governor to name the witness to be subpoenaed and examined.

Original proceeding in mandamus. Opinion filed December 9, 1911. Demurrer to answer sustained.

*S. D. Bishop,* for the plaintiff.

*S. N. Hawkes,* assistant attorney-general, and *S. M. Brewster,* special assistant attorney-general, for the defendant.

The opinion of the court was delivered by

BENSON, J.: This is an action in mandamus to require the attorney-general to prosecute a proceeding under a section of the prohibitory liquor law, which authorizes the attorney-general and prosecuting attorneys who may be notified or who have knowledge of the violations of that act to issue subpoenas and examine witnesses touching its violation. (Laws 1909, ch. 164, § 6, Gen. Stat. 1909, § 4366.)

The application for the writ states the following facts: In June, 1911, a newspaper writer residing in Topeka wrote a letter to a syndicate of newspapers, published throughout the state, containing the following statement:

"The writer spent a portion of an evening in a club in a small Kansas town not long ago. The town is in territory supposed to be strictly dry. Still, they were selling beer openly over a bar. With these conditions

prevailing everywhere why should all the odium of the situation be hung on Cherokee and Crawford counties?"

On July 1 following the governor directed the attorney-general to subpœna the writer of the letter and hold an inquiry as provided in section 4366 of the General Statutes of 1909, as shown by the following communication:

"DEAR MR. DAWSON—In a recently published newspaper article signed by J. E. House of Topeka, Kansas, appears the statement that he spent a portion of an evening in a club in a small Kansas town not long since where they were selling beer openly over a bar. He also asserted that the cities of Lawrence and Emporia are overrun with bootleggers, and that the situation at Leavenworth, Wichita and Topeka were such, and nobody conversant with the situation believes there is not law violation.

"Judging from this public admission, I am constrained to believe Mr. House to be in possession of evidence of law violation that would serve to speedily and justly punish the guilty. Therefore you are hereby directed to subpœna the said J. E. House, hold an inquisition, and take his testimony relative to this violation of the prohibitory liquor law, and from such testimony, if specific, base a prosecution of the violators.

"I will appreciate a prompt action upon the part of your department."

The attorney-general answered as follows:

"YOUR EXCELLENCY—Your letter of July 7, erroneously dated July 1, at hand. In it you call my attention to the signed newspaper article of J. E. House, junior editor of the *Topeka Capital*. That article stated, among some general and indefinite allegations relating to violations of the prohibitory law, that Mr. House has recently attended a dinner at a private club in a small town at which liquors were sold. I had already taken up this matter on June 30th by correspondence with Mr. House, and obtained such information as he cared to give.

"Perhaps this occasion is a good time for your excellency and myself to understand our relative po-

sitions concerning matters of this sort. You 'directed' me to subpœna Mr. House and make him tell what he knows about the matters contained in his article. That 'direction' is not within the scope of your authority; neither was your telegram of some time ago that I should subpœna Judge Sapp and make him come to Topeka on a similar errand. These are matters left to my discretion. The law authorizes the senate of the state of Kansas, or the house of representatives or the governor to 'direct' the attorney-general to prosecute or defend any case of public concern, but such 'direction' must give the attorney-general the facts concerning the specific subject matter to be litigated, the parties to the litigation, and the names of the witnesses by whom the facts can be proven. Anything less definite than this is not a 'direction' at all; anything more is beyond the scope of your authority.

"I trust that you will believe that this letter is written in the most kindly and courteous spirit, and is only done to set your excellency right as to the relationship of our respective departments and to avoid misunderstanding in the future. As heretofore, my department will prosecute or defend any specific case in which your excellency is interested, but I must have the facts and the witnesses in all such cases, for only in such manner and by such means can any litigation be successful."

Thereupon the governor replied, calling attention to certain constitutional provisions, quoting the statement contained in the letter as copied above, and saying:

"In your reply of the 7th you say: 'I had already taken up this matter on June 30th, by correspondence with Mr. House, and obtained such information as he cared to give.' . . . Under the constitution of this state I am held responsible for the execution of the laws of the state. I am not satisfied to accept 'such information as he cared to give.' I request that you subpœna Mr. J. E. House, under the provisions of paragraph 4366 of the General Statutes of 1909, and compel him under oath to disclose all the information and knowledge he has regarding the incident referred to, and all other information he has respecting the violation of the laws of this state relating to intoxicating liquors; and I further request that this be done at once, and such proceedings instituted as the evidence so secured warrants."

The attorney-general responded, saying that his attention was first called to the article referred to on June 30, and that he had that day addressed a letter to the writer, Mr. House, setting out a copy, and adding:

"His reply was strictly of a personal nature and I do not think it proper to furnish it. But in addition to his written reply I took the matter up with him personally and learned what I surmised, which was that Mr. House, being a guest and a stranger, did not know who were selling liquors nor the persons who were buying liquors, and he had nothing to tell of any consequence, nor upon which to base a prosecution. So, too, his general statements that Wichita, Leavenworth, Topeka and Lawrence were overrun with bootleggers. Mr. House only knows such matters by mere hearsay and on that subject he is possessed of no information that would be of the slightest assistance to a prosecuting officer."

The governor in another letter then called attention to the positive nature of the statement contained in the article published in newspapers over the state, and said:

"It is impossible for me to conceive of ordinary social functions where 'they were selling beer openly over a bar.' Likewise it is impossible for me to conceive of an answer to your official communication as attorney-general calling for information respecting infractions of the prohibitory law of this state being 'of so strictly a personal nature' that you do not think it proper to furnish it to the chief executive officer of the state, whose duty it is under the constitution to see that the laws are faithfully executed. Your letter was signed in your official capacity. It would be impossible to reply thereto in a manner that would be so 'strictly personal' as to be improper to be seen."

References were again made in this letter to the constitution and certain statutory provisions, followed by the statement:

"For the purpose of enabling me to faithfully execute the laws of this state, it is necessary that a proceeding be instituted and that Mr. J. E. House be subpœnaed to testify and give information as to the city and the

The State, *ex rel.*, v. Dawson.

building wherein he was present when intoxicating liquors were sold over a bar, and also that he be required to give the names of any persons who were present, known to him; that he give under oath a full statement of persons who have told him of the violation of law, to the end that such persons may be subpœnaed. If these statements made by Mr. House over his signature are pure fabrication and without foundation, I want the world to know it, in order that the good name of this state may be protected. . . . I therefore once again request that you institute proceedings of inquiry, and that you subpœna Mr. J. E. House of Topeka, Kansas, to appear before you at a time and place to be designated in the subpœna, then and there to testify under oath concerning any violations of the provisions of the prohibitory laws of this state."

This letter indicated the purpose of the governor to apply to this court for a writ of mandamus. The attorney-general responded:

"Yours of to-day at hand. I am entirely willing to arrange a test case in the supreme court to determine whether the subpœnaing of witnesses by the attorney-general is left to his discretion or to the governor, and therefore, and for that purpose, for the present I most respectfully decline to issue a subpœna for Mr. J. E. House."

The application states that Mr. House has knowledge and information that would enable the attorney-general to prosecute suits to suppress violations of the law referred to, which can not be obtained from him otherwise than by proceedings under the section referred to, and which it is alleged it is the duty of the attorney-general to institute; wherefore the relator prays that he be compelled by mandamus to so proceed as requested and to furnish to the governor a copy of the testimony when taken. The defendant answered the application without the issuance of an alternative writ; the relator demurred to the answer, and thus the issue is presented. The answer admits the material facts stated in the application, but denies that the writer referred to has knowledge or information concerning vio--

lations of the prohibitory law which could be of value to a prosecuting officer in the prosecution of suits to suppress such violations. The answer also sets out various reasons why the attorney-general believed it unwise to comply with the governor's requirement, and avers that he has acted in entire good faith in the matter. Among the reasons so given it is stated in substance that he had proceeded in another way to investigate the transaction referred to in the newspaper article; that from such investigation he believed the writer of the latter was mistaken as to the intoxicating quality of the beverage; that Mr. House, through his weekly letters to Kansas newspapers, reaches a circulation of 150,000; that the writer of the letter has heretofore criticised the attorney-general; and that the exercise of the power as requested might appear to be for political purposes, but that he would nevertheless have faced this dilemma had it not been for his confidence that the necessary information could be obtained by less drastic methods. The answer avers that the investigation so begun has not been concluded, and contains the following averment:

"That he [the attorney-general] has at all times acknowledged the right of the governor to direct the attorney-general to prosecute or defend any action in which the state is interested or a party, and defendant has always complied therewith; but defendant denies the right of the governor to dictate the management of any such a cause, and alleges that any such cause must be prosecuted according to the judgment and discretion of one trained in the profession and practice of law."

It is not believed to be necessary to set out the answer more fully. The attorney-general in his brief says:

"The attorney-general, believing that no good would be accomplished by subpœnaing [the witness] declined to do so."

The real question then to be determined is whether the attorney-general is subject to the direction of the governor with respect to the matter concerning which he was required to act or whether he may in his discretion refuse to comply with such requirement. If it be a matter within his discretion the answer is sufficient, otherwise it is not. The good faith and zeal of that officer is not questioned.

The constitution declares:

"The supreme executive power of the state shall be vested in a governor, who shall see that the laws are faithfully executed." (Const. art. 1, § 3.)

"He may require information in writing from the officers of the executive department, upon any subject relating to their respective duties." (Const. art. 1, § 4.)

"The officers of the executive department, and of all public state institutions, shall, at least ten days preceding each regular session of the legislature, severally report to the governor, who shall transmit such reports to the legislature." (Const. art. 1, § 16.)

We do not find that the meaning of the phrase "The supreme executive power," as contained in our constitution and the constitutions of many other states of this Union, has ever been precisely defined, although the matter is referred to in some decisions. Perhaps the term itself taken in connection with the context is sufficiently explicit. An executive department is created consisting of a governor and the other officers named, and he is designated as the one having the supreme executive power, that is, the highest in authority in that department. In the same connection it will be noticed that the other executive officers are required to furnish information upon subjects relating to their duties, and to make annual reports to him, and withal he is charged with the duty of seeing that the laws are faithfully executed. It is manifest from these various provisions that the term "supreme executive power" is something more than a verbal adornment of

the office, and implies such power as will secure an efficient execution of the laws, which is the peculiar province of that department, to be accomplished however in the manner and by the methods and within the limitations prescribed by the constitution and statutes enacted in harmony with that instrument.

"When a constitution gives a general power, or enjoins a duty, it also gives, by implication, every particular power necessary for the exercise of the one, or the performance of the other. The implication under this rule, however, must be a necessary, not a conjectural or argumentative one. And it is further modified by another rule, that where the means for the exercise of a granted power are given, no other or different means can be implied, as being more effectual or convenient." (*Field v. The People,* 3 Ill. 79, 83.)

In harmony with the provisions of the constitution, and to provide the governor with means to execute the laws as required by that instrument, the legislature has declared that he may require the attorney-general to prosecute or defend for the state in any cause or matter in which the state is interested. The statute declares:

"The attorney-general shall appear for the state, and prosecute and defend all actions and proceedings, civil or criminal, in the supreme court, in which the state shall be interested or a party, and shall also, when required by the governor or either branch of the legislature, appear for the state and prosecute or defend, in any other court, or before any officer, in any cause or matter, civil or criminal, in which this state may be a party or interested." (Laws 1879, ch. 166, § 71, Gen. Stat. 1909, § 8906.)

This provision is mandatory in its terms, but it remains to be considered whether the proceeding referred to under the prohibitory law is a cause or matter within the purview of the statute; whether the duty to prosecute includes the commencement of such proceedings, and whether it also includes the duty to

summon and examine a particular individual when so directed in the circumstances appearing in this case.

That such a proceeding is a "matter" "in any . . . court, or before any officer, . . . in which this state may be a party or interested" is too clear to admit of serious debate. It would be difficult to find language more comprehensive reaching to all public official proceedings in which the state has an interest.

The word "prosecute" implies the commencement as well as the continuance of a proceeding, and the term is so used in common speech as well as in legal parlance, and it was so held in *The State v. Bowles,* 70 Kan. 821, 79 Pac. 726, where a prosecution instituted by an indictment signed by an assistant attorney-general who acted under the direction of the governor in pursuance of this statutory provision was upheld. Construing a statute of Wisconsin of the same import it was held in *Emery and another v. The State,* 101 Wis. 627, 78 N. W. 145:

"So that the attorney-general rightly appeared and assisted in the prosecution of this case does not admit of question. It was not within his discretion to comply or refuse to comply with the governor's request, or within the discretion of the circuit court to permit or refuse to permit him to participate in the trial." (p. 646.)

This construction is in harmony with the decision in the Bowles case, *supra,* and with the constitutional declaration that the supreme executive power is vested in the governor.

The remaining question is whether the designation of the witness is fairly incidental to the authority of the governor to direct a proceeding under this statute; not whether the governor in an ordinary trial or proceeding may direct what particular witnesses shall be examined, nor whether the executive may control the ordinary details of judicial proceedings. Such controversies will be infrequent, and when they do arise

will probably be considered in the light of the emergency disclosed by the facts of the particular case. We are not required to explore and delimit the frontiers of the supreme executive power upon this general subject, but only to decide the question presented upon this record. The determination of a single controversy arising within the circle of a coördinate department of government will not be used as an opportunity to foreshadow opinions upon possible controversies which may never arise.

The section of the statute under which the governor directed the prosecution to be instituted provides for a distinct proceeding quite unlike ordinary actions or proceedings where the examination of witnesses is merely incidental. Here the examination of a witness constitutes the proceeding. It is instituted for that purpose. It provides that:

"If a county attorney, attorney-general or assistant attorney-general . . . shall be notified . . . of any violation of any of the provisions [of this law] . . . it shall be his duty forthwith diligently to inquire into the facts of such violation, and . . . is . . . authorized to issue subpœnas for such persons as he shall have any reason to believe have any information concerning or knowledge of such violation." (Gen. Stat. 1909, § 4366.)

The attorney-general having been notified was bound to investigate, and he did so by correspondence and otherwise, but refused to institute the proceeding, or prosecute in the definite matter as required. This could be done only by examining the particular witness. The witness and the incident to which he referred in the newspaper article were not to be separated in the proceeding ordered by the governor. The proceeding, or as the statute designates it, the matter in which he was directed to prosecute, was the examination of that witness. Suppose after the governor had directed the prosecution referred to in *The State v. Bowles,* 70 Kan. 821, 79 Pac. 726, the attorney-general had concluded to

investigate the subject in some other way, and instead of presenting the matter to the grand jury, had called the witnesses to his office and upon inquiry thus made had determined to proceed no further, would such disposition have been permissible? If it was within the attorney-general's discretion to do so, and thus finally dispose of the matter, there is little virility in the statute which in express terms gives the governor the power to require prosecutions. The conclusion is that the matter, to use the statutory term, which the attorney-general was required to prosecute, was the examination of the witness as provided in the statute, and it was the duty of the attorney-general to do so.

While, as pointed out in his brief, manifold and arduous duties rest upon the attorney-general, the governor is charged with the execution of the law, and this can only be done through means provided by the constitution and laws. Among these is the assistance of the attorney-general, and in the enforcement of the prohibitory law, the power of that officer to examine witnesses touching its violation. If the governor may not invoke that power, then he is denied recourse to means which the legislature believed to be necessary to its enforcement.

The question decided arises upon the interpretation of constitutional and statutory provisions. We have not found it necessary to go far afield for authorities, although many have been considered. It may be added, however, that the recent case of *State ex rel. Haskell, Governor, v. Huston, Judge, et al.*, 21 Okla. 782, 97 Pac. 982, has been found illuminating and instructive. A statute of Oklahoma contains a provision like our own requiring the attorney-general to prosecute and defend actions and proceedings when requested by the governor. Construing this statute, and the constitutional provisions that the governor shall cause the laws to be faithfully executed, it was held that the governor of Oklahoma under the constitution and statutes of that

.state had the power to dismiss an action brought by the attorney-general in the name of the state, and that he might himself maintain an action in the name of the state to prohibit the attorney-general from carrying on the action brought by that officer. Whether under our laws the governor would have this power of dismissal does not arise here, but the decision cited is instructive concerning the principles involved, and reviews many authorities.

For the reasons stated the answer is held insufficient, and the demurrer thereto is sustained.

WEST, J. (dissenting) : The state government is not modeled on the cabinet system. On the contrary, the constitution expressly provides (Const. art. 1, § 1) that the executive department shall consist of a governor, lieutenant-governor, secretary of state, auditor, treasurer, attorney-general, and superintendent of public instruction. These officers are all chosen by the people, all under like öath and alike subject to impeachment. Each has a field of official discretion which can not be invaded by any other officer. It is the unquestioned and unchanging law that official discretion can not be controlled by mandamus. As said in *Martin, Governor, v. Ingham*, 38 Kan. 641, 17 Pac. 162:

"The only acts of public functionaries which the courts ever attempt to control by either injunction or *mandamus*, are such acts only as are in their nature strictly ministerial; and a ministerial act is one which a public officer or agent is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, and without regard to his own judgment or opinion concerning the propriety or impropriety of the act to be performed." (p. 651.)

Here, in order to form the basis for the issuance of the writ, it has been necessary to rule that the act directed to be done is one clearly ministerial and outside the pale of discretion. This conclusion is founded on a

provision of the statute that the attorney-general shall, "when required by the governor or either branch of the legislature, appear for the state and prosecute or defend, in any . . . court, or before any officer, in any cause or matter, civil or criminal, in which this state may be a party or interested." (Laws 1879, ch. 166, § 71, Gen. Stat. 1909, § 8906.) This section vests no other or greater power in the governor than in either branch of the legislature, and the effect of the decision is that the requirement by the latter would be compulsory upon the attorney-general to subpœna before himself or some other officer any certain witness which either house of the legislature should deem requisite.

While the word "prosecute" does doubtless imply the commencement as well as the continuance of a proceeding, it is well to notice the language of the statute under which inquisitions may be held. Section 4366 of the General Statutes of 1909 (Laws 1909, ch. 164, § 6) provides that it shall be the duty of the attorney-general, upon proper notification, forthwith diligently to inquire into the facts of the alleged violation of the prohibitory law, and for that purpose he is "authorized" (not required) to issue subpœnas for such persons as he shall have reason to believe have any information, etc. The same section expressly provides that, "if the testimony so taken shall disclose the fact that an offense has been committed, . . . the attorney-general . . . shall prosecute the person or persons committing such offense." Hence, under this statute, the duty to prosecute and the beginning of a prosecution can arise only after the testimony has been taken, and the taking of such testimony is not a prosecution or the beginning thereof, but a mere step preparatory thereto. A mere preliminary step taken in view of a possible future prosecution can not, without wresting language from its ordinary meaning, be held to be included in the section requiring the attorney-general to appear for the

13—86 KAN.

state and prosecute or defend in any cause or matter. In an inquisition the attorney-general is not defending any one and is not prosecuting any one, but is merely procuring testimony in order to see whether a prosecution shall be instituted.

In a county where the county attorney fails or refuses to enforce the law, section 4378 of the General Statutes of 1909 (Laws 1887, ch. 165, § 5) makes it the duty of the attorney-general to enforce it himself, "and for that purpose he may appoint as many assistants as he shall see fit." Would it be contended that any other officer can dictate to him who his appointees shall be, or whom he shall "see fit" to appoint? He is merely authorized to make such appointments, as he is by the other section authorized to subpœna witnesses. There is no mandatory requirement contained in either. If once the domain of discretion is invaded, if the attorney-general can not be permitted to exercise in good faith his own judgment touching the steps preliminary or preparatory to a prosecution, no reason suggests itself why he should be permitted to exercise it in respect to the witnesses he shall call during a trial, the order in which they shall be introduced, the questions he shall propound or the policy to be pursued. Any one who has had experience in conducting prosecutions arising out of the prohibitory law knows that caution and tact, as well as good judgment and legal learning, are necessary, and it is often essential that the prosecutor, instead of putting a hostile witness in position to warn the culprit, let not his left hand know what his right hand doeth.

To require by mandamus the performance of an act so manifestly within the realm of official discretion— one, at most, authorized, but not required, by the statute—sets, in my judgment, a dangerous precedent, and departs from the theory upon which the executive department of the government has heretofore been conducted.

PORTER, J. (dissenting) :  I concur in the foregoing dissenting opinion of Mr. Justice West.  I think it is due to the attorney-general to say that no pretense is made that he has been or is opposed to the enforcement of the prohibitory law, or that he has even been lukewarm in the performance of his duties in that respect.  On the contrary, the record in this case discloses what every person familiar with public affairs knows to be true— that the attorney-general has devoted a very large portion of his time and energies, since he took his office, to the vigorous enforcement of the liquor law in every part of the state where it has been violated.  It is to be regretted that this court has been called upon to give serious and grave consideration to what turns out to be a mere "tempest in a teapot."  From the correspondence between the two officials, which was conducted entirely through the public press, instead of in the usual and ordinary course, it seems to be the desire of one of the parties to have a certain person compelled to testify as a witness concerning his knowledge of alleged violations of the prohibitory law.  If the only purpose of the governor was to bring about the prosecution of some person or persons supposed to have violated the law, it seems quite obvious that all that was necessary for him to do in the discharge of his supreme executive duty of enforcing the law was to direct the attorney-general to investigate the alleged violation and to prosecute the guilty persons, furnishing such information as he possessed as to names of witnesses; and leaving it to that officer to use his own judgment and discretion as to the means to be employed in such prosecution.  The statute prescribes what the duties of the attorney-general are when he has been notified that the law has been violated. It authorizes but does not require him to issue subpœnas for such witnesses.  If, in his judgment, he has sufficient information to warrant the filing of an information, he may proceed at once without causing any witness to be examined before an officer.

Ample means are provided by the constitution for removing from office an unfaithful constitutional officer. If the attorney-general fails to perform his duty, or acts corruptly, he can be removed by impeachment; but we have no right to compel him to perform any act which is discretionary. This court has in a number of instances ousted from office a county attorney who so neglected the prosecution of criminal cases as to forfeit his right to the office, but no one has ever supposed the court could by mandamus compel a county attorney to perform an act which involves his discretion; for instance, to call a particular witness to the stand or to conduct a prosecution in a particular way. The effect of the decision in this case is that, at the suit of the governor, this court can by mandamus compel the attorney-general to conduct the prosecution of any criminal or civil proceeding in the way the governor has directed, and to call to the stand any witness whom the governor for any purpose of his own may desire to have testify, and without regard to whether to do so would in the judgment and discretion of the chief law officer prejudice the best interests of the state. If the governor has this authority, he necessarily has the power to direct when the examination of such witness shall end, what questions shall be asked, and may direct and control the conduct of any prosecution which the attorney-general has instituted for the enforcement of any law.