No. 28,526.

THE STATE OF KANSAS, *Appellee*, v. GALEN FINCH, *Appellant*.

(280 Pac. 910.)

Opinion filed October 5, 1929.

*William A. Smith*, attorney-general, *Lester Goodell* and *Paul Harvey*, both of Topeka, for the appellant.

*J. G. Logan*, county attorney, and *Paul H. Heinz*, of Topeka, for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: This controversy involves a consideration of the respective duties and powers of the attorney-general and county attorney—the question whether the attorney-general may control a liquor prosecution without the concurrence of, or in opposition to,

the county attorney. The defendant imparted information to the attorney-general concerning a violation of the prohibitory liquor law. The information was conveyed to the county attorney, who caused the arrest of one Jerry Brown, who pleaded guilty, and in so doing implicated the defendant, against whom the county attorney began this prosecution. The attorney-general appeared and filed a motion to dismiss. The motion was overruled, and in spite of the efforts of the attorney-general to stop the prosecution the case proceeded to trial at the instance of the county attorney. The defendant was convicted, and appeals.

The facts were substantially these: About ten days before his arrest in this action Galen Finch visited and conversed with the attorney-general. The substance of Finch's conversation was that he knew of a still in operation or about to be operated in Topeka, by Brown. Finch stated that he would advise the attorney-general when liquor was to be run from the still. About 5 o'clock p. m. on January 23, 1928, Finch came again to the office of the attorney-general and informed him that the still was in operation. The attorney-general tried to reach first the sheriff and then the county attorney, but was unsuccessful. He then called the federal prohibition director, gave him the name and address and asked him to get in touch with local officers and endeavor to make a raid. The prohibition director got in touch with the sheriff. A deputy sheriff conducted a raid that evening at the place suggested by Finch, arresting Brown and seizing the still. Members of the sheriff's force informed Brown that Finch "had turned him in." When that information was given Brown he told the officers that Finch was in partnership with him. Finch was arrested later the same evening.

It would serve no useful purpose to detail the evidence. (See *State v. Rose,* 124 Kan. 37, 257 Pac. 731.) It is sufficient to say that the information which led to the successful prosecution of Brown was furnished by Finch. It was transmitted by an unbroken chain to the prosecuting officers of Shawnee county. There is no claim of any independent source of information, and it is admitted that the attorney-general told Finch he would be immune from prosecution for the exact offense for which he is now being prosecuted. No formal inquisition was held by the attorney-general, but he agreed that Finch would be immune from prosecution. Such understandings are common with prosecuting officers in cases where conviction of one defendant can be accomplished only through in-

formation obtained from an accomplice. It is not necessary to consider whether such an agreement would be binding if the prosecutor later chose to violate it. The attorney-general did not repudiate his understanding with Finch, but used every effort to carry it out.

The legal effect of these circumstances involves a consideration of the respective powers and duties of the attorney-general and county attorney. It is not contemplated by our constitution and statutes that the attorney-general shall appear in every prosecution for crime, though he does frequently appear in the district court. The statute provides that the attorney-general shall consult with and advise county attorneys, when requested by them, in all matters pertaining to their official duties. (R. S. 75-704.) Adequate enforcement of the law involves coördinated action upon the part of these officials as well as all state and local executive officials. In our scheme of government the attorney-general is the chief law officer, subject only to direction of the governor and the legislature.

In *State, ex rel., v. Dawson*, 86 Kan. 180, 119 Pac. 360, the authority of the governor to direct the attorney-general was considered. It was held that—

"The provisions of article 1 of the constitution which vests the supreme executive power in the governor implies that the governor is the highest in authority in the executive department, with such power as will secure a faithful execution of the laws in the manner and by the methods prescribed by the constitution and statutes in harmony with that instrument. . . . The statute making it the duty of the attorney-general, when required by the governor, to appear for the state and prosecute in any court or before any officer, in any cause or matter, civil or criminal, in which the state may be a party or interested, is mandatory." (Syl.)

In the opinion it was said:

"We do not find that the meaning of the phrase, 'The supreme executive power,' as contained in our constitution and the constitutions of many other states of this union, has ever been precisely defined, although the matter is referred to in some decisions. Perhaps the term itself taken in connection with the context is sufficiently explicit. An executive department is created consisting of a governor and the other officers named, and he is designated as the one having the supreme executive power, that is, the highest in authority in that department." (p. 187.)

In an early Illinois decision it was held:

"When a constitution gives a general power, or enjoins a duty, it also gives, by implication, every particular power necessary for the exercise of the one, or the performance of the other. The implication under this rule, however, must be a necessary, not a conjectural or argumentative one. And it is fur-

ther modified by another rule, that where the means for the exercise of a granted power are given, no other or different means can be implied as being more effectual or convenient." (*Field v. The People*, 3 Ill. 79, 83.)

## Our own statute declares:

"The attorney-general shall appear for the state, and prosecute and defend all actions and proceedings, civil or criminal, in the supreme court, in which the state shall be interested or a party, and shall also, when required by the governor or either branch of the legislature, appear for the state and prosecute or defend, in any other court, or before any officer, in any cause or matter, civil or criminal, in which this state may be a party or interested." (R. S. 75-702.)

And so, while primarily the governor is charged with the execution of the law, next to him the attorney-general is the chief law officer of the state. Some observations concerning the development of the attorney-general's duties and powers are not amiss. In Massachusetts Law Quarterly (May, 1921, p. 100) it is said:

"The office of the attorney-general is of considerable antiquity. Its early history and growth in England are traced in an article by Mr. Holdsworth, the learned historian of English law, in 13 Ill. Law Rev. 602, wherein its development is shown to have been essentially completed before the main migration of our ancestors to this country."

## In 2 Thornton on Attorneys at Law, 1131, it is said:

"The office of attorney-general is of very early origin in England, though the first patent of appointment which can be found seems to be one dated 1472. At common law the attorney-general was the chief representative of the sovereign in the courts, and it was his duty to appear for and prosecute in behalf of the crown any matters—criminal as well as civil. It was said by Mr. Blackstone: 'He represents the sovereign, in whose name all criminal processes issue, and his power to prosecute all criminal offenses is unquestioned at common law.' It would seem, therefore, that the attorney-general may exercise common-law powers unless the constitution or statute law, either expressly or by reasonable intendment, forbids the exercise thereof; and under the colonial government the attorney-general received his appointment from the governor of the colony, and exercised his duties under the common law. . . . A state attorney-general, in many jurisdictions, may exercise all the common-law powers incident to and inherent in his office, in addition to such authority as may be expressly conferred upon him by the state constitution and general laws. . . . The attorney-general of a state is its principal law officer. His authority is coextensive with the public legal affairs of the whole community. . . . As the representative of the state, an attorney-general is empowered to bring any action which he deems to be necessary for the protection of the public interests. His authority in this respect is necessarily implied from the nature of his office, and will be presumed to exist, in the absence of evidence to the contrary. . . . And, as a rule, the attorney-general

has power, both under the common law and by statute, to make any disposition of the state's litigation that he deems for its best interest; for instance, he may abandon, discontinue, dismiss, or compromise it. But he cannot enter into any agreement with respect to the conduct of litigation which will bind his successor in office, nor can he empower any other person to do so. . . . The attorney-general may dismiss any suit or proceeding, prosecuted solely in the public interest, regardless of the relator's wishes. . . . Where the attorney-general is empowered, either generally or specially, to conduct a criminal prosecution, he may do any act which the prosecuting attorney might do in the premises; that is, he can do each and every thing essential to prosecute in accordance with the law of the land, and this includes appearing in proceedings before the grand jury. So an attorney-general, even at common law, had the right to enter a *nolle prosequi,* although he could not do so during the trial without leave of court." (pp. 1143, 1149, 1151, 1160, 1161, 1164.)

In 2 R. C. L. 913 it is said:

"Defined generally an attorney-general is the chief law officer of a state or nation, to whom is usually intrusted not only the duty of prosecuting all suits or proceedings wherein the state is concerned, but also the task of advising the chief executive, and other administrative heads of the government, in all legal matters on which they may desire his opinion. . . . The office of prosecuting or district attorney, unlike that of attorney-general, is of modern creation, with its duties chiefly prescribed by statute. The civil and criminal business of the state which once pertained actually, as well as theoretically, to the office of attorney-general has been divided between the two offices for purposes of convenience. In fact, the office of prosecuting attorney has been carved out of that of attorney-general and virtually made an independent office. In the exercise of his common-law powers the attorney-general undoubtedly may advise the prosecuting attorney as he does other officers, since he is regarded as the chief law officer of the state; but in practically all jurisdictions, either the constitution or laws of the state make the two offices separate and distinct, and vest in the prosecuting attorney certain powers, and impose upon him certain duties, which can be neither increased nor decreased by the attorney-general. The sense in which the local officer is subordinate to the general one seems to be that they are engaged in the same branch or department of the public business, which of course makes the relation theoretical rather than practical. . . . At common law the duties of the attorney-general, as chief law officer of the realm, were very numerous and varied. He was the chief legal adviser of the crown, and was intrusted with the management of all legal affairs and the prosecution of all suits, civil and criminal, in which the crown was interested. He alone could discontinue a criminal prosecution by entering a *nolle prosequi* therein. . . . It is generally acknowledged that the attorney-general is the proper party to determine the necessity and advisability of undertaking or prosecuting actions on the part of the state. Thus it has been held that the discretion of the attorney-general in determining what the public interests require as to bringing an action against a domestic business corporation or its officers is absolute, and cannot be made the subject of inquiry by the courts. In like manner,

under a statute imposing upon the attorney-general the duty of enforcing a prohibition law whenever it is not enforced in any county of the state, it is held that he is clearly the sole person to judge of the existence of the statutory grounds calling for intervention on his part. As a rule the character of the duties pertaining to the office are such as call for the exercise of personal judgment based upon the facts and circumstances surrounding each particular question." (pp. 914, 915, 919.)

In *People v. Kramer,* 68 N. Y. S. 383, it was said in the opinion:

"The common law of England was the law of our colonial government. The attorney-general, under the colonial government, received his appointment from the governor of the colony, and exercised his duties under the common law. Later on he was commissioned by the crown. The attorney-general, at common law, was the chief legal representative of the sovereign in the courts, and it was his duty to appear for and prosecute in behalf of the crown any matters—criminal as well as civil. It was said by Blackstone (3 Bl. Comm. 27): 'He represents the sovereign, in whose name all criminal processes issue, and his power to prosecute all criminal offenses is unquestioned at common law.'" (p. 386.)

In *The People v. Miner,* 2 Lans. 397 (N. Y.), it was said:

"As the powers of the attorney-general were not conferred by statute, a grant by statute of the same or other powers would not operate to deprive him of those belonging to the office at common law, unless the statute, either expressly or by reasonable intendment, forbade the exercise of powers not thus expressly conferred. He must be held, therefore, to have all the powers belonging to the office at common law, and such additional powers as the legislature has seen fit to confer upon him." (p. 399.)

In *State, ex rel. Ford, v. Young et al.,* 54 Mont. 401, it was said in the opinion:

"It is the general consensus of opinion that in practically every state of this Union whose basis of jurisprudence is the common law, the office of attorney-general, as it existed in England, was adopted as a part of the governmental machinery, and that in the absence of express restrictions, the common-law duties attach themselves to the office so far as they are applicable and in harmony with our system of government. (6 Corpus Juris, 805, 809; 2 R. C. L., p. 916; *Hunt v. Chicago, H. & D. Ry. Co.,* 121 Ill. 638, 13 N. E. 176; *Ex Parte Young,* 209 U. S. 123, 14 Ann. Cas. 764, 13 L. R. A., n. s., 932, 52 L. Ed. 714, 28 Sup. Ct. Rep. 441; *State v. Robinson,* 101 Minn. 277, 20 L. R. A., n. s. 1127, 112 N. W. 269.)" (p. 403.)

In *State, ex rel. Nolan, v. Dist. Court,* 22 Mont. 25, it was said in the opinion:

"Enumeration of his duties is made by article VIII, secs. 460 *et seq.,* Political Code. Among other requirements therein mentioned, he is to exercise a supervisory power over county attorneys in all matters pertaining to the duties

of their offices, and from time to time to require of them reports as to the condition of public business intrusted to their charge.

"A duty to exercise supervisory power clearly implies the possession of supervisory power. There is, therefore, in the attorney-general a right to over-see for direction, to inspect with an authority all matters pertaining to the duties of the county attorneys of the state, and to direct with superintending oversight the official conduct and acts of such officials; and it is his prescribed duty to exercise and perform these acts, and to do whatever may be necessary and proper to render his power in these respects effective. Duty to exercise general supervisory power over county attorneys would not, however, necessarily carry with it a duty to actively assist a county attorney in the discharge of his duties, for supervision might be exerted without actual assistance." (p. 27.)

See, also, *Commonwealth v. Kozlowsky,* 238 Mass. 379; *State v. Robinson,* 101 Minn. 277; *Ex Parte Young,* 209 U. S. 123; *State v. Fisheries Co.,* 120 Me. 121.

The English common law furnished the basis of American jurisprudence. It was prevalent throughout the territory now known as Kansas from the earliest times down to October 31, 1868, when the present statute was enacted which provides that—

"The common law as modified by constitutional and statutory law, judicial decisions, and the conditions and wants of the people, shall remain in force in aid of the general statutes of this state." (R. S. 77-109.)

See, also, *Sattig v. Small,* 1 Kan. 170; *Kans. Pacific Rly. Co. v. Nichols, Kennedy & Co.,* 9 Kan. 235; *Clark v. Allaman,* 71 Kan. 206, 80 Pac. 571.

We conclude that the attorney-general's powers are as broad as the common law unless restricted or modified by statute.

Prohibition of the beverage liquor traffic and the attorney-general's relation thereto is properly a matter for consideration here. Legal prohibition in Kansas has had a progressive development from the initial regulation of the saloon and tavern (chapters 53, 64, 77, 84, Territorial Laws 1855) down to and including the bone-dry act enacted in 1917 (R. S. 21-2101) and the anti-still law enacted in 1923 (R. S. 21-2111). By the adoption of the prohibition amendment to our constitution in 1880 (Laws of 1879, ch. 165), and the enactment of the prohibitory law in support thereof (Laws of 1881, ch. 128) Kansas established prohibition as a part of the state's public policy. In so doing it became a pioneer in the inauguration of this policy although other courts had long since taken judicial notice of the fact that the beverage liquor traffic had been the domi-

nant cause of crime, misery and pauperism; that intoxicants, directly or indirectly, had sent more people to jails, penitentiaries and insane asylums than any other cause; that a large percentage of all crimes charged against persons arraigned in the courts was properly attributed to the use of intoxicating liquor. Judicial notice means that courts consider, without evidence, those matters of public concern which are known to all well-informed persons. For instance, the relation of intoxicating liquor to crime was recognized by the supreme court of the United States as far back as 1847. In the License Cases (5 How. 504, 632, 12 Law Ed. 256, 592), then under consideration, it was said by Mr. Justice Grier:

"It is not necessary for the sake of justifying the state legislation now under consideration to array the appalling statistics of misery, pauperism and crime which have their origin in the use or abuse of ardent spirits."

In *Mugler v. Kansas*, 123 U. S. 623, Mr. Justice Harlan, writing the opinion for the court, said:

"We cannot shut out of view the fact, within the knowledge of all, that the public health, the public morals and the public safety, may be endangered by the general use of intoxicating drinks; nor the fact established by statistics accessible to everyone, that the idleness, disorder, pauperism and crime existing in the country, are, in some degree, at least, traceable to this evil." (p. 662.)

In *Crowley v. Christensen*, 137 U. S. 86, it was said:

"By the general concurrence of opinion of every civilized and Christian community, there are few sources of crime and misery to society equal to the dram shop. . . . The statistics of every state show a greater amount of crime and misery attributable to the use of ardent spirits obtained at these retail liquor saloons than to any other source. . . . There is no inherent right in a citizen to sell intoxicating liquors by retail; it is not a privilege of a citizen of the state or of a citizen of the United States." (p. 91.)

The supreme court of Ohio in *Adler v. Whitbeck*, 44 Ohio St. 539, said that the liquor traffic is the "acknowledged source of much of the crime and pauperism in the state." (p. 568.)

The supreme court of Illinois in *Schwuchow v. City of Chicago*, 68 Ill. 444, characterized the liquor traffic in these words:

"We presume no one would have the hardihood to contend that the retail sale of intoxicating drinks does not tend in a large degree to demoralize the community, to foster vice, produce crime and beggary, want and misery." (p. 448.)

In *State v. Durein*, 70 Kan. 1, 80 Pac. 987, this court said:

"Intoxicating liquor is . . . the prolific source of disease, misery, pauperism, vice and crime. Its power to weaken, corrupt, debauch and slay human

character and human life is not destroyed or impaired because it may be susceptible of some innocent uses, or may be used with propriety on some occasions. The health, morals, peace and safety of the community at large are still threatened." (p. 21.)

Organized society always has the right to invade the domain of personal liberty when the safety or general improvement of the community is at stake. This state, having long since learned that the use of alcohol as a beverage is a great physical evil and a standing menace to her people, that beverage alcohol destroys physical and mental vitality and resistance to disease, that it increases poverty and ignorance, that it stimulates vice and crime, determined to exercise its inherent right to prohibit it. Such right is the exercise of police power, a power which the state uses for the protection of society as a whole. The argument that the prohibition law interferes with individual liberty and that the individual has never had his day in court is answered by the decisions of the highest courts, that the individual has no inherent right to do anything which interferes with the general welfare.

The framework and plan of our intoxicating liquor law contemplates a central law enforcement head. That head is the attorney-general. Under that law he is given authority and power not ordinarily given in other laws. The intoxicating liquor law provides:

"Whenever the county attorney shall be unable or shall neglect or refuse to enforce the provisions of this act in his county, or for any reason whatever the provisions of this act shall not be enforced in any county, it shall be the duty of the attorney-general to enforce the same in such county . . . and he and his assistants shall be authorized to sign, verify and file all such complaints, information, petitions, and papers as the county attorney is authorized to sign, verify or file, and to do and perform any act that the county attorney might lawfully do or perform." (R. S. 21-2125.)

Under the provisions of this statute there need be no finding or even belief by the attorney-general that the county attorney is corrupt or that he has neglected to enforce the provisions of such law in his county. If the attorney-general believes that the plan or system followed by the county attorney is ineffective he may go in even though he believes the county attorney is acting in entire good faith. In the instant case the attorney-general thought that the prosecution of Finch would be a detriment rather than an aid to the enforcement of the intoxicating liquor law. Under such circumstances it was not only his power but his duty to take charge of that particular prosecution and conduct it according to his best judg-

ment. He was not required to make any formal or written statement of a finding in determining whether he thought the prohibitory liquor law was or was not being enforced in Shawnee county.

There are three ways in which a criminal prosecution may be carried forward in this state—by private prosecutor in compliance with certain statutory requirements, by the county attorney, and by the attorney-general. Ordinarily a case is commenced and prosecuted to conclusion by one of the methods enumerated and without conflict between them. In case of conflict the superior officer has control of the prosecution. It is necessary in the prosecution or the defense of any case, civil or criminal, that some one be in charge. It follows that where the attorney-general is lawfully prosecuting in a county he has complete charge of the prosecution. In *State v. Bowles*, 70 Kan. 821, 79 Pac. 726, it was said:

"When directed by the governor or either branch of the legislature to appear and prosecute criminal proceedings in any county he (the attorney-general) becomes the prosecuting attorney of that county in those proceedings, and has all the rights that any prosecuting officer there may have, including those of appearing before the grand jury, signing indictments, and pursuing cases to final determination." (p. 827.)

The prosecutor in charge may dismiss a case not instituted by him.

"While the county attorney is not required to take part in a preliminary examination in a felony case unless requested to do so by the magistrate, if he does appear he is entitled to have full charge of the prosecution, and the case should be dismissed if he so directs." (*Foley v. Ham*, 102 Kan. 66, syl., 169 Pac. 183.)

The attorney-general is not required to take part in a liquor prosecution, but if he does appear he is entitled to have full charge of the prosecution and the case should be dismissed if he so directs. The denial of the motion of the attorney-general to dismiss in the instant case is assigned as error. In *Foley v. Ham*, supra, it was said in the opinion:

"Notwithstanding that the county attorney is not required to attend a preliminary examination unless asked to do so, we hold that he may appear if he sees fit, and when he does his authority is as complete as though his presence had been requested. The proceeding, while somewhat informal, is an adversary one. It is accusatory or litigious rather than inquisitorial in character. It has something of the aspect of a voluntary investigation conducted by the magistrate, while exercising a function somewhat analogous to that of a grand jury, to determine whether or not there is ground for a prosecution. But under our practice it is quite different from that. It constitutes actual litigation between opposing parties. Testimony taken at such a hearing may be

used at the trial in the district court, if the attendance of the witness cannot be had (*State v. Chadwell*, 94 Kan. 302, 146 Pac. 420; 8 R. C. L. 213, 214), a course which could scarcely be justified if the proceedings were not essentially judicial—a trial between opposing parties presided over by a judge. The state is the plaintiff, and the state's attorney, rather than the complaining witness or any other unofficial person, is entitled to speak in its behalf, and decide upon the course to be pursued in its interest." (p. 69.)

What was said concerning the power of the county attorney in the Foley case applies in any case conducted by the attorney-general. In *Martin v. State, ex rel.*, 39 Kan. 576, 18 Pac. 472, it was held that the county attorney of Stevens county had no right to institute proceedings in the district court of Shawnee county without the consent and against the objection of the attorney-general.

The enforcement of the prohibitory liquor law involves elements not ordinarily present in the enforcement of other laws. Liquor is easily concealed; the market for it is widely distributed. With the means of transportation now available liquor made in one county is sometimes wholly marketed in another; ordinarily more than one person is involved in its handling or in its production and sale. These conditions sometimes require law-enforcement officers to obtain information from persons who have themselves violated the law. Such a method is not unusual when attempting to strike at the source of the supply and the larger dealers. Such conditions have made it imperative that effective law-enforcement work be carried on more or less generally over the state by one head rather than leaving the task entirely to the efforts of local officers who make arrests for small violations in their own communities. For example, one offender may manufacture liquor in one county and sell and deliver the entire output to his runners (retailers) in another county far distant from the one in which it is made. The retailer is arrested and prosecution commenced in his own county. It would hamper law enforcement if the attorney-general could not control the prosecution and even dismiss the action against a retailer in order to convict the manufacturer or wholesaler of the liquor, if he in good faith believes that the wiser course, and the refusal of the county attorney to coöperate and dismiss the case against the retailer would hamper the enforcement of the law as much as failure and refusal to prosecute generally. The power effectively to control a prosecution involves the power to discontinue, if, and when, in

the opinion of the prosecutor in charge this should be done. We are of the opinion the trial court should have sustained the attorney-general's motion to dismiss in the instant case. This conclusion necessarily disposes of the case and obviates discussion of other points raised in the briefs.

The judgment is reversed and the cause remanded with instructions to dismiss the case.

HARVEY, J., not sitting.