No. 41,072

STATE OF KANSAS, ex rel., ROBERT J. FOSTER, County Attorney of Wyandotte County, Kansas, *Plaintiff*, v. CITY OF KANSAS CITY, KANSAS, a Municipal Corporation; PAUL F. MITCHUM, Mayor Commissioner; EARL B. SWARNER, Commissioner of Finance, Health and Public Property; JOSEPH P. REGAN, Commissioner of Boulevards, Parks and Streets; and QUINDARO TOWNSHIP, Wyandotte County, Kansas, a Body Politic and Corporate, *Defendants;* PHILLIPS PETROLEUM COMPANY, a Corporation, UNION PACIFIC RAILROAD COMPANY, a Corporation, SEALRIGHT-OSWEGO FALLS CORPORATION, a Corporation, and GIRTEN INVESTMENT COMPANY, a Corporation, *Petitioners for Leave to Intervene.*

(350 P. 2d 37)

Opinion filed March 5, 1960.

*John Anderson, Jr.,* attorney general, argued the cause, and *Robert E. Hoffman* and *A. K. Stavely,* assistant attorneys general, were with him on the briefs for plaintiff.

*Leonard O. Thomas,* of Kansas City, argued the cause, and *J. D. Lysaught, Robert H. Bingham, Ervin G. Johnston, Thomas M. Van Cleave, James J. Lysaught, Williard L. Phillips, Thomas M. Van Cleave, Jr., J. E. Schroeder,* and *Lee E. Weeks,* all of Kansas City, were with him on the briefs for defendant Quindaro township.

*J. W. Mahoney,* of Kansas City, argued the cause, and *C. W. Brenneisen, Jr.,* and *George E. Haley,* both of Kansas City, were with him on the briefs for defendant city of Kansas City.

*Thomas M. Lillard* and *O. B. Eidson,* both of Topeka, and *Nona E. Snyder,* of Kansas City, were on the briefs for intervenor Union Pacific Railroad Company.

*Leonard O. Thomas, Robert H. Bingham,* and *Ervin G. Johnston,* all of Kansas City, were on the briefs for intervenors Phillips Petroleum Company, Sealright-Oswego Falls Corporation, and Girten Investment Company.

The opinion of the court was delivered by

ROBB, J.: This original proceeding in quo warranto commenced by the state, on the relation of the county attorney, seeks to test the validity of certain ordinances of the city of Kansas City by requiring the defendant city officials, Mitchum, Swarner, and Regan, in their official capacity, to show by what authority they assumed a portion of the Fairfax industrial district and made it part of the city when they enacted and published certain ordinances annexing such land.

Two previous original quo warranto proceedings of similar character have been before this court. (*State, ex rel., v. City of Kansas City,* 169 Kan. 702, 222 P. 2d 714; *State, ex rel., v. City of Kansas City,* 181 Kan. 870, 317 P. 2d 806.)

The state filed its amended and supplemental petition naming the city, Mitchum, Swarner, Regan, and Quindaro township as defendants. On October 8, 1958, Quindaro township filed its answer admitting the allegations of the petition and referring in detail to the two previous cases above mentioned. It attacked the city's efforts to annex by ordinances the land in question, which is a part of Quindaro township. On October 28, 1958, the city and its named officials (hereafter referred to collectively as the city) by way of answer filed a general denial of the affirmative allegations in Quindaro's answer and a general demurrer thereto was incorporated into its answer. On the same day the city, in answer to the amended and supplemental petition of the state, admitted a major portion thereof and joined issue on the remainder. On November 13, 1958, the state filed a lengthy reply to the answer of the city. Since the merits of the case are not before us at this stage of the proceedings, we shall not detail the above-mentioned pleadings.

The parties failed to agree upon a stipulation of facts and as a result of a renewed application dated April 22, 1959, for appointment of a commissioner, this court on June 30, 1959, appointed the Honorable Jay W. Scovel of Independence, Kansas, as com-

missioner to hear the evidence, which procedure was the same as that followed in the two earlier cases previously referred to.

Donald E. Martin's term of office as Wyandotte county attorney expired in January, 1959, and his newly-elected successor, Robert J. Foster, assumed the duties of the office including the substitution of his name for that of Martin in this case. On July 22, 1959, the attorney general, under the directive set forth in the first part of G. S. 1949, 75-702 (later quoted herein) filed a motion to intervene in the case, to supersede county attorney Foster, and to strike all references in the pleadings to Quindaro township, as well as its answer and cross petition, because the township had no justiciable interest, it was neither a necessary nor proper party, and its answer and cross petition had no lawful place in the proceeding. The attorney general further moved that in view of the expense to the taxpayers of past litigation on this annexation problem of the city, it would be in the public interest to terminate and dismiss the present action.

Acknowledgment of service by Foster was as follows:

"The undersigned County Attorney of Wyandotte County, Kansas, hereby acknowledges receipt of a copy of the foregoing Motion and states and *he has read the same and lodges no objection to supersession by the Attorney General in such action.* [Our emphasis.]

"/s/ Robert J. Foster, County Attorney of Wyandotte County, Kansas, Kansas City, Kansas."

After service on it, Quindaro filed a formal objection to the attorney general's intervention because the matter was ready for trial before the commissioner and the attempted supersession was only to prevent submission of the controversy and prevent judicial determination of the rights of thousands of people.

At the same time Quindaro also filed its formal objection to the attorney general's motion to dismiss because if granted such motion would prevent Quindaro from furnishing essential government services to its 17,674 residents by permitting the ordinances under attack to stand as valid. The attorney general had moved to intervene eighteen months after commencement of the case and after the commissioner had fixed the date the hearing was to begin. Validity of the ordinances was of great importance to the taxpaying residents of Quindaro and the city. Due to the one year statute of limitation for filing such actions (G. S. 1959 Supp. 12-502c), the motion to dismiss was an attempt to secure final determination without a hearing on the merits. If permitted the attorney general's

action would usurp the judicial power vested in the court and would thereby break down our traditional doctrine of separation of powers by substitution of one man's views for those of a duly-constituted court. The attorney general is without authority to interfere with the county attorney herein, and in the interest of justice the attorney general's motion should be overruled. Finally, it was claimed the attorney general's action violated sections 1 and 18 of the bill of rights and sections 1 and 2 of article 3 of our state constitution.

Quindaro also filed a motion for permission to maintain the action if the county attorney was held not to be able to do so. Quindaro alleged its readiness, willingness and ability to present the case to the commissioner.

The city filed its motion for judgment on the pleadings as against Quindaro because Quindaro had no legal capacity to sue, no material issue of fact was presented by its answer which admitted the allegations of the petition, and no valid cause of action or defense was stated as to the city.

At the hearing before the commissioner on August 17, 1959, Quindaro filed a motion to stay and substantially stated that on August 10, 1959, the governor had directed the attorney general not to dismiss the proceeding but to prosecute it and assure all parties an opportunity to present the issues to the commissioner and the court; that the attorney general had no authority to continue with his motions and they should be stayed and stricken.

The record discloses that Foster appeared and was present during the hearing of August 17, 1959, at the close of which he made the following statement:

". . . I have an interest in the case as County Attorney, I have taken no affirmative action other than I have not objected to Mr. Anderson's motion to supersede me, because I believe that is my duty."

At that time four corporations filed separate applications for leave to intervene as owners of land sought to be annexed. In brief, their principal complaint was that the ordinances had been passed and officially published without notice to them or opportunity to be heard, and if the ordinances were allowed to become effective, the corporations would be subject to city taxes, control and other burdens; and further, if subsequent to the commencement of the action and after eighteen months of waiting, the attorney general were allowed to carry out his purpose, the

result would be the taking of each intervenor's property without due process of law in violation of the fourteenth amendment to the federal constitution.

We have not set out the complete contents of the pleadings because they contain facts, contentions and issues necessary to a complete determination of the merits of the case which, as we have already stated, is not presently the issue before us.

The governor and attorney general of our state are constitutional officers under the executive branch of our government, as provided in article 1, section 1 of our Kansas constitution. The terms of G. S. 1949, 75-108 provide:

"Whenever the governor shall receive notice of the commencement of any action or proceedings, by which the rights, interests or property of the state shall be liable to be affected, he shall inform the attorney general thereof, and require him to act in conjunction with the counsel of the proper party to protect the interests of the state; and in any such case, or in any action prosecuted or defended in behalf of the state, he may, if the public interests require it, employ such counsel as he shall deem proper to assist in any such action or proceeding; and in case of the absence or sickness of the attorney general, or if he shall be in any way interested adversely to the state in any action or proceeding, the governor may employ counsel to act in his stead."

G. S. 1949, 75-702 provides:

"The attorney general shall appear for the state, and prosecute and defend all actions and proceedings, civil or criminal, in the supreme court, in which the state shall be interested or a party, and shall also, when required by the governor or either branch of the legislature, appear for the state and prosecute or defend, in any other court or before any officer, in any cause or matter, civil or criminal, in which this state may be a party or interested."

In view of the plain, clear and unambiguous language of the first portion of 75-702, it is mandatory upon the attorney general to appear in this court as stated therein and any additional direction from the governor could have no more effect than the legislative mandate. We are not called upon, and we are not now determining whether the attorney general, before appearing "in any other court" would have to be required to do so by the governor, or either branch of the legislature.

It follows that in this court any case in which the attorney general appears involves the public interest. The corollary is likewise true because wherever the public interest is involved or the state is a party, the attorney general is primarily the proper counsel to appear.

Duties of a county attorney are prescribed in G. S. 1949, 19-702, as follows:

"It shall be the duty of the county attorney to appear in the several courts of their respective counties and prosecute or defend on behalf of the people all suits, applications or motions, civil or criminal, arising under the laws of this state, in which the state or their county is a party or interested."

No useful purpose would be served by discussing all the cases where county attorneys have appeared when the state was a party, or interested, because in no case was his right so to do challenged, considered, or determined, as we are here required to do.

In view of Foster's acknowledgment of service of the attorney general's motion, together with his quoted statement at the hearing of August 17, 1959, to the effect that he was not objecting to the intervention and supersession of the attorney general, and in view of the fact that he sat at the counsel table with the attorney general and conversed with him during oral argument before this court, it appears fair to conclude that Foster was in accord with the manner in which the attorney general was conducting the case. To put it in another way, if Foster had any objection, he should have made it known to the court. On the contrary, he said he was not objecting. The result is he could only have been consenting. By his further action of sitting beside and conversing with the attorney general, instead of with Quindaro's counsel or with some of the numerous other counsel present who apparently were adverse to the attorney general's action, Foster acquiesced in that action. This court in an original proceeding certainly has the right and authority to rely on the appearances and conduct of counsel during the presentation of the matter. By mentioning Foster's attitude, we in nowise desire to create the impression that we are minimizing the power and authority of the attorney general as a real and proper party to appear, prosecute or defend in this court on behalf of the state, as provided in G. S. 1949, 75-702, above quoted, where the rights of the state or the public interest is involved. (Dassler's Kansas Civil Code, Annotated, 2d ed., Quo Warranto, § 13, p. 818; § 22, p. 823.) Had there been any controversy between Foster and the attorney general, that situation is well discussed in the opinion in *State v. Finch*, 128 Kan. 665, 280 Pac. 910, where immunity granted to an informer in a liquor prosecution was within the discretion of the attorney general whose dismissal of the county attorney's attempted prosecution case of the informer was held

to be proper by this court. The Finch case, so far as it applied to the rank of the county attorney and attorney general, was relied on in *State, ex rel., v. State Highway Comm.,* 133 Kan. 357, 299 Pac. 955.

In regard to a contention as to the governor's authority for giving his direction to the attorney general not to dismiss the case but to proceed to final judgment on the merits, we pause to note a few of the cases cited on this point. *State, ex rel., v. Dawson,* 86 Kan. 180, 119 Pac. 360, involved a mandamus action to require prosecution under the prohibitory liquor law by the attorney general and this court therein stated the governor had authority to direct the attorney general to examine a witness when a violation of the liquor law came to his attention. It must be remembered, however, that a prosecution for violation of the prohibitory liquor law would have been brought elsewhere than in the supreme court and also that the prohibitory liquor law conferred more power on the governor than he possesses in other cases in which the state may be involved. (*State v. Finch,* supra, p. 667, where the Dawson case, *supra,* was cited.) Our attention is further directed to *Markham v. Cornell,* 136 Kan. 884, 18 P. 2d 158, in which former Governor Harry Woodring, by a long distance telephone call from New York to his private secretary, directed him to send a requisition to the secretary of state requesting a commission for the appointment of Markham as superintendent of public instruction to fill a vacancy caused by death. This attempt by the governor to perform an official act while outside the territorial limits of the state was held to be of no effect, but at the same time his absence from the state did not "constitute his becoming 'incapable of performing the duties of the office' so as to permit the lieutenant governor to assume the powers and duties of the governor." (Syl. ¶¶ 1, 2.)

We cannot agree with the contentions that these cases are determinative of the question now before us. A more recent similar case is *In re Lord,* 255 Minn. 370, 97 N. W. 2d 287. There the Minnesota supreme court issued restraining orders in regard to the establishment of daylight saving time. The attorney general by radio and television challenged the supreme court's right to make such an order, and upon the governor's advice, refused to appear before the court to explain or deny his statements. Briefly stated, the Minnesota court held that in preserving the separation of powers of the three branches of government, the governor has

no power to clothe the attorney general with immunity from the disciplinary powers of the court when the attorney general appears in court as an attorney; that courts have no jurisdiction over the executive in the performance of executive functions and it is equally vital to our form of government that the executive shall have no power to interfere with the courts in the performance of judicial functions; and finally, that one who is admitted to practice as an attorney at law is an officer of the courts and both by virtue of his oath of office and the customs and traditions of the legal profession, he owes to the courts the highest duty of fidelity. (Syl.)

Applying the above reasoning to our present case we conclude the attorney general by his motion to intervene and supersede the county attorney exercised his powers and duties under the constitution and appropriate statutes; this was as far as he could go as an executive officer and as an attorney and officer of this court. Since he is an officer of the judicial branch, under the separation of powers of the three branches of government, he was limited and restricted in his conduct before this court by the code of professional ethics (164 Kan. xi) to the same extent any other lawyer would be. If, therefore, the attorney general considered the action unmeritorious, he not only had the authority, but he also had a duty to move for dismissal. We cannot think that the framers of our state constitution or the members of the legislature ever intended that the governor should have control over the judicial branch, or its officers, as is advocated by Quindaro in its brief. Each of the three branches of our government should be zealous of its jurisdiction and each should also be vigilant to see that it does not encroach upon the jurisdiction of the other two.

Any plaintiff has an absolute right to dismiss his action any time before submission (G. S. 1949, 60-3105; *Bavuso v. Angwin,* 166 Kan. 469, 201 P. 2d 1057) and in *Kinsch v. Missouri-Kansas-Texas Railroad Co.,* 183 Kan. 224, 326 P. 2d 327, when plaintiff moved to dismiss before final submission, this court held the trial court committed reversable error in overruling such motion. We need not burden this opinion with a lengthy discussion of authorities cited on this well-established point.

We now come to the question of Quindaro's status in this proceeding. In *State, ex rel., v. City of Kansas City,* 169 Kan. 702, 719-721, 222 P. 2d 714, Quindaro, along with four rural high school districts of Wyandotte county, filed briefs *amici curiae* in support of plaintiff's attack on similar annexation ordinances affecting the

Fairfax industrial district because of the resulting loss of taxes to Quindaro and the school districts. This court substantially there stated that the legislature has the authority to create municipal corporations, to modify their boundaries by increasing or decreasing them, or to disorganize such municipalities. To the same effect is *State, ex rel., v. School District,* 163 Kan. 650, 654, 185 P. 2d 677, wherein *State, ex rel., v. French,* 111 Kan. 820, 208 Pac. 664, and *School District v. Board of Education,* 110 Kan. 613, 204 Pac. 758, were cited as authority for the proposition that school districts, like many other municipalities, are creatures of the legislature and are subject not only to its power to create, but also to its power to modify or dissolve. Such school districts therefore have no vested rights in their existence and are subject to the legislature's power to extend or limit their boundaries, consolidate two or more under one, or abolish one or more of them altogether.

The most favorable interpretation to be made of the pleadings of Quindaro and the intervenors indicates they are attacking the city's attempt to extend its corporate limits to include new territory, which is a reorganization of the city that in turn involves its corporate validity. Such an attack can only be made by the state. The landmark case of *Smith v. City of Emporia,* 168 Kan. 187, 211 P. 2d 101, 13 A. L. R. 2d 1272, makes this point crystal clear and includes a thorough discussion of many of the leading cases cited by the parties to this appeal. See, also, *Lampe v. City of Leawood,* 170 Kan. 251, 253, 254, 225 P. 2d 73.

In *City of Blackwell v. City of Newkirk et al.,* 31 Okla. 304, 121 Pac. 260, the conclusion of the Oklahoma supreme court likewise was that only the state may question extensions of city limits and, as shown in the opinion (p. 329), this conclusion was based at least in part on decisions of our Kansas court.

There appears to have been no violation of article 4, section 4 of the federal constitution or of the fourteenth amendment. These questions were fully discussed and decided in *Kies v. Lowrey,* 199 U. S. 233, 239, 240, 26 Sup. Ct. 27, 50 L. ed. 167, and we shall not repeat them in detail except to say that a state legislature has absolute power to make and change subordinate municipalities such as counties, towns and school districts because they are auxiliaries of the state. In *Hunter v. Pittsburgh,* 207 U. S. 161, 28 S. Ct. 40, 52 L. ed. 151, the city of Pittsburgh, Pennsylvania, undertook to annex the city of Allegheny even though the latter, a much smaller city, had voted by majority vote against the annexation.

Hunter, along with three other residents who were citizens, voters, taxpayers, and owners of real and personal property in Allegheny, filed exceptions to the petition of Pittsburgh, and Pittsburgh answered the exceptions. Allegheny was allowed to intervene with the four citizens but made no changes in the record. The exceptions of the four citizens to the petition there alleged were more far-reaching than the contentions set out by Quindaro here, but the same rules, in substance, were applied in affirming the disallowance of the exceptions of the four citizens, joined in by the City of Allegheny as intervenor.

We conclude the findings of fact made by our commissioner which are substantially set out herein are correct and they are approved. However, in view of the many authorities cited by the parties, all of which have been considered though only a few have been mentioned herein, we find ourselves unable to agree with the commissioner's recommended conclusions of law except that part where he denied the petitioning corporations leave to intervene by reason of their not being proper parties, as shown in *Smith v. City of Emporia*, supra. We further conclude the attorney general was entitled to intervene for the reasons that (1) Foster, as county attorney, lodged no objections to the action of the attorney general, and, in fact, he appeared to cooperate with him; and (2) following the applicable rules of law, the attorney general is superior to a county attorney in appearances before this court in original cases involving the state, or the public interest. Once the attorney general in his executive capacity appears in this court, he has the duty as an officer of this court, to limit his conduct as prescribed by the code of professional ethics; the governor, although the head of the executive branch of our state government, cannot control the authority and power of the officers of this court, which heads up the judicial branch of our state government. As previously stated, the attorney general, plaintiff herein, had an absolute right to dismiss this action and the allegations in Quindaro's pleadings must fall because they clearly show that Quindaro, one municipality, is questioning the organization, or reorganization, of the city, another municipality, and this can be done only by the state through its proper officers.

Other contentions of the parties need not be determined.

The ultimate result is we hereby terminate this particular proceeding by ordering that the case be dismissed.

It is so ordered.