BOARD OF PUBLIC UTILITY COMMISSIONERS OF NEW JERSEY, WHO SUE IN THE NAME AND FOR THE USE OF THE STATE OF NEW JERSEY, APPELLANTS, v. LEHIGH VALLEY RAILROAD COMPANY, RESPONDENT.

Argued October 16, 1929—Decided February 3, 1930.

412

For the appellants, *John O. Bigelow.*

For the respondent, *Hobart & Minard.*

The opinion of the court was delivered by

PARKER, J.  In a suit begun in the Supreme Court under the above title, for the enforcement of a penalty of $100 per day for default of compliance by the respondent with an order of the board touching the abolition of a grade crossing, pursuant to section 33 of the statute commonly known as the Public Utilities act (*Pamph. L.* 1911, *ch.* 195—at *p.* 387), there was a motion to strike out the answer and supplemental answer, and some forty-three defenses therein specified, which motion was heard by Judge Oliphant of the Circuit Court sitting as a Supreme Court commissioner pursuant to the act of 1926 (*Pamph. L., p.* 103), and rules 92 to 94 of the Supreme Court as revised in 1926. The commissioner struck out all of the defenses except paragraph 11 of the first defense, and the second, fourth, thirty-sixth and thirty-seventh defenses; but conceiving that Nos. 36 and 37 went to the root of the case and that the motion, as tantamount to a demurrer, opened the whole record, adjudged that the complaint itself should be dismissed and the summons quashed. This determination was followed by a rule entered by authority of a justice of the Supreme Court, directing the quash-

ing of the summons and dismissal of the complaint. This, as tantamount to a final judgment, constitutes a proper basis for review by this court. *Eames* v. *Stiles*, 31 *N. J. L.* 490.

So far as the second defense, and paragraph 11 of the first defense, relate to the time when the penalty began to run, they are not attacked on this appeal, as will more fully appear presently. The fourth defense, which will also be taken up more fully later on, deals with alleged inability for legal reasons to comply with the order. The real nub of the controversy, however, is in the thirty-sixth and thirty-seventh defenses which are substantially alike and raise the points that the suit should be by the state itself, and be conducted by the attorney-general, and as a corollary, that counsel for the board appointed by authority of the Utility act, section 5, is without authority to bring or conduct this suit in its behalf.

As to the first branch of the proposition, that the suit should be in the name of the state itself, as provided by section 33 of the Utility act, the record shows explicitly that the state is the party in interest, although the board may figure as a relator. See *Anderson* v. *Myers,* 77 *N. J. L.* 186. The precise form of language seems not material. The important question is that of control of the litigation, whether by the board and its counsel as state agents, or by the attorney-general as the usual accredited legal adviser of the state itself. On this branch of the case we conclude that the powers and privileges of the attorney-general as they existed at common law and particularly as conferred by statute, are subject to change and modification by legislative enactment; and that in the matter of the board of public utilities the legislature has conferred upon that board and upon counsel appointed by it pursuant to the statute, the power of commencing and conducting litigation in which the board in exercise of the power vested in it is seeking to enforce its mandates.

It may be stated as a broad general proposition that upon the separation of the American colonies from the crown, and the erection therein of independent governments, the common law powers and duties of attorney-general in England de-

volved upon similar officials in the various states, and according to the text of 6 *C. J.* 809, 810, no attempt was made by state legislatures to enumerate or define them. A very instructive list of such powers and duties appears in the report of *People* v. *Miner, 2 Lans. (N. Y.)* 396, 398, which is abstracted in the footnote on 6 *C. J.* 809, and need not be reproduced here. On page 810 of 6 *C. J.,* it is stated in the text that "subject to constitutional *limitations,* it is within the power of the legislature to increase, alter or abridge the powers and duties of the attorney-general." Both these general propositions are illustrated in the history of New Jersey legislation.

The index of English statutes at large under the title of "Attorney General," fails to show any legislation of consequence relating to his duties, and only three statutes are referred to under that heading. There is nothing about this title in the index to *Leaming and Spicer's Grants and Concessions of New Jersey.* Likewise, there is nothing under this title in the index in *Allison's New Jersey Laws,* published in 1776. Consequently, it may be reasonably assumed that the duties of Cortlandt Skinner, the last attorney-general of New Jersey under the crown, and the duties of William Paterson appointed in 1783, were substantially the same in their sphere as those of the attorney-general in England in his. The first constitution of New Jersey, adopted in 1776 (1 *Comp. Stat.,* xxxi) is silent on the subject of the attorney-general except that by paragraph XII his term of office is to be five years and he is to be appointed by the council and assembly "in manner aforesaid." By paragraph XXII it is prescribed "that the common law of England, as well as so much of the statute law, as have been heretofore practiced in this colony, shall still remain in force, until they shall be altered by a future law of the legislature; such parts only excepted as are repugnant to the rights and privileges contained in this charter." It would seem that as there was no provision in this constitution saving any particular rights and powers of the attorney-general, the legislature was free to deal with the subject under the general rule that a state

legislature is unhampered in its enactments except by some express or plainly implied provision of the constitution; as will appear, it has in fact acted with entire freedom in the matter.

*Paterson's Revision* exhibits nothing in relation to the attorney-general, except the *Quo Warranto* act, page 177, imposing on him the duty to prosecute recognizances either himself or through an attorney appointed by the court to prosecute the pleas in his absence, pages 180 and 181; and similar provisions relating to recognizances of tavern keepers, pages 239 and 240.

In the opinion of Mr. Justice Nevius in *State, ex rel. Clawson* v. *Thompson*, 20 *N. J. L.* 689 (at *p.* 690), it is stated that prior to 1812 the attorney-general was accustomed to appoint a temporary deputy to prosecute the pleas in counties where he could not himself attend; but in 1812 an act was passed reciting in its preamble that doubts had arisen touching this practice (*Pamph. L.* 1812, *p.* 23; *R. S.* 557) and expressly authorizing him to do so. This seems to have proven unsatisfactory, and in 1822 another act was passed (*Pamph. L., p.* 25) repealing the act of 1812 and providing in lieu thereof that prosecutors should be appointed by the Court of Quarter Sessions, which then consisted of the justices of the peace of the county, or any three of them. See *Croasdale* v. *Atlantic Q. S.* 5; 88 *N. J. L.* 506, 507. After only a year, the legislature again found it necessary to intervene and in *Pamph. L.* 1823, *p.* 52; *Har. Comp.* 49; *Elm. Dig.* 448, we find an act reciting that the present mode of appointing prosecutors "is liable to abuses, and tends to the great injury of the state, by the choice, in many instances, of incompetent persons, and is also contrary to the rights of the people, by taking away from them, or their representatives in assembly, the election of public officers, and vesting the same in justices of the peace" and providing that in each county there shall be a prosecutor of the pleas to be appointed by council and assembly in joint meeting, to serve for five years, "whose duty it shall be to prosecute the pleas of the state in such county in the absence of the attorney-

general," &c. So that we have the legislature asserting its authority over the attorney-general, first, in ratifying his appointment of subordinates; secondly, in taking that power of appointment from him and lodging it in the county courts; and thirdly, by itself assuming the appointing power. Moreover, the office of prosecutor became distinct and separate; for in the Clawson case, *ubi supra,* it was definitely held that it was incompatible with that of the attorney-general; that prosecutors were not deputies of the attorney-general under the act of 1823, nor were they accountable to him. *Ibid.* 691. No one seems to have claimed that under the constitution of 1776 (which, like that of 1844, says nothing about the attorney-general except to prescribe the manner of his appointment and to fix his term), the powers and duties of the attorney-general were immune to legislative interference.

The constitution of 1844, as just stated, provides for the appointment and term of the attorney-general, and of a number of other state officials, including prosecutors of the pleas. *Art. VIII,* § 2, ¶ 4. But it says nothing about their powers or duties.

In 1846 the legislature revised the act of 1823 relating to prosecutors of the pleas but without any change material to the present inquiry. But in 1854 we find a very important change in the law brought about by the passage of an act entitled "An act to define the duties and fix the salary of the attorney-general." (*Rev.* 1877, *p.* 56). This act provides that, "it shall be the duty of the attorney-general, when not incompatible with his other public duties, to be present at the seat of government during the session of the legislature, to give to the members of the senate and assembly, and to the executive, and all the officers of the state government, such legal information as they may from time to time request, examine and decide all cases submitted for his opinion by the state superintendent of common schools, attend in any county of the state for the trial of homicide cases, or other high crimes, on the written request of a justice of the Supreme Court, or of the board of chosen freeholders of any county,

upon all applications for loans of the school fund to inspect the title papers, and determine the security offered, and attend generally to all matters in which the state is a party, or in which its rights and interests are involved." In respect to this act it may be noted that the attorney-general was to attend in any county only on the written request of a justice of the Supreme Court or of the board of chosen freeholders. This is explained by section 3 of the same act which provides that after its passage, the criminal business of the state shall be prosecuted exclusively by the prosecutors of the pleas, except in counties where, for the time being, there may be no prosecutor, or where the prosecutor desires the aid of the attorney-general. Later on in the section there is a recognition of the power of the Supreme Court justice or board of chosen freeholders to request the attorney-general to attend. But it will be seen that this act deprives the attorney-general of all power to prosecute the pleas in any county except where he is requested to do so either by the prosecutor or by the justice of the Supreme Court or by the board of chosen freeholders. And so, in 1890, the Supreme Court held that the right to apply for *certiorari* of an indictment on the part of the state was exclusively that of the prosecutor of the pleas. *State* v. *New Jersey Jockey Club*, 52 *N. J. L.* 493. A glance at later legislation will show that in recent years the legislature has undertaken, and without challenge, to modify the powers of the attorney-general. In *Pamph. L.* 1911, *p.* 325, the statute provides that he may attend personally or by his assistant in any county of the state to prosecute the criminal business on request of a justice of the Supreme Court. In 1916 section 2 of the act of 1911 relating to compensation was repealed, but in 1920 this repealer was itself repealed. *Pamph. L.* 1916, *p.* 560; *Pamph. L.* 1920, *p.* 549. This act of 1911 was considered in the case of *O'Reardon* v. *Wilson*, 4 *N. J. Mis. R.* 1008; 135 *Atl. Rep.* 280; *affirmed*, 104 *N. J. L.* 181. In 135 *Atl. Rep.* 280, the Supreme Court remarks on page 281, "the constitution of 1844 recognizes the existence of the office of prosecutor of the pleas, and provides for the filling of that office

and the term thereof. It does not, however, specify any of the duties or powers of the incumbent." The court proceeds to point out the act of 1846 and the act of 1854 above mentioned and concludes that the constitution by necessary implication had left the determination of the question of the scope of the powers and duties attached to the office of prosecutor of the pleas entirely to the legislative body, together with the right to determine whether under unusual conditions those powers and duties should temporarily be exercised and performed by the attorney-general either personally or by his designated assistant.

The same reasoning can fairly be applied to the office of attorney-general except that in the case of prosecutors of the pleas, the office was a new one originally created by the legislature and its duties had to be prescribed either directly or by reference to those of the attorney-general; whereas, in the case of the attorney-general, the duties descended from the common law; but both were equally within the control and jurisdiction of the legislature. As was said in *State* v. *Zabriskie,* 43 *N. J. L.* 369, 372, except as modified by constitutional or statutory regulation, his (the attorney-general's) functions here are similar to those exercised by the representatives of the crown there.

The legislature in its assertion of the right to control the powers and duties of the attorney-general did not stop at this point; for in 1904 it proceeded to enlarge the scope of those duties by statute, viz., an addition by way of amendment to section 1 of the act of 1854, reading: "And to act as adviser or counsel for all state boards, commissions or other state officials, and to be in connection with such assistants as may be employed in his department, the sole legal adviser, attorney or counsel thereof, and to represent them in all suits or actions of any kind that may be brought for or against them in any courts of this state." We have here a distinct legislative provision which, if unaltered or unrepealed, would require the attorney-general to act as the counsel of the board of·public utility commission. However, it would seem that his power in that respect would be de-

rived from the statute and not from anything in the constitution either of 1776 or 1844. The latter instrument in section 1 of article X provides that the common law and the statute law as now in force, not repugnant to this constitution, shall remain in force until they expire, by their own limitation, or be altered or repealed by the legislature. It also provides that the several courts of law and equity, except as otherwise provided, shall continue with like power and jurisdiction as if the constitution had not been adopted. But there is no reservation of any pre-existing duties or powers of the attorney-general therein contained. And in *State* v. *De Lorenzo,* 81 *N. J. L.* 613, 616, *et seq.,* the late Mr. Justice Garrison, speaking for this court, discussed and overruled the argument that the mention of the office of sheriff (in paragraph 7 of the same section 2 of article 4 of the constitution of 1844 that in paragraph 4 speaks of the attorney-general) "constituted *ipso facto* a limitation imposed by that instrument upon the legislature by force of which the legislature is forever debarred from altering in any essential aspect the mode in which jurors were selected by that official at the time of the adoption of the constitution." The discussion of the point in that opinion, too long to be quoted or even abstracted, is particularly apposite here. Among other things, he points out that the proposition, if sound, must apply to every other office designated with a like purpose in the same article of the constitution (foot of page 618), which in paragraph 4 includes the attorney-general. The case of *Virtue* v. *Freeholders,* 67 *Id.* 139, holding to the contrary, was expressly overruled.

Turning now to the Public Utility act (*Pamph. L.* 1911, *p.* 374), we find that although by section 33 it contemplates litigation by way of *mandamus,* injunction, or specific performance as against recalcitrant public utilities, and a suit in debt for a penalty of $100 per day, there is not a word in the whole statute to indicate who is to conduct such suits, except the provision in section 5, that the board "shall appoint a secretary, counsel and such other employes as it may deem necessary, fix their duties, compensation and term of

service." The board accordingly appointed counsel, who has represented it throughout the several phases of this litigation; on the original application to the writer of this opinion, for a writ of *certiorari* to the order; *Lehigh Valley Railroad Co.* v. *Board,* 5 *N. J. Mis. R.* 559; 137 *Atl. Rep.* 443; on the second application to the court *in banc,* 5 *N. J. Mis R.* 587; 137 *Atl. Rep.* 923; in the litigation in the federal courts, ending in the Supreme Court of the United States, 278 *U. S.* 24; 49 *Sup. Ct. Rep.* 69. Following this, the board through the same counsel instituted and conducted proceedings in *mandamus* to compel obedience to the order. *Board* v. *Lehigh Valley Railroad Co.,* 144 *Atl. Rep.* 589; 7 *N. J. Mis. R.* 160. The authority of counsel was there questioned by the present respondent, but not passed upon by the court, which put its refusal of a writ on the ground that the case was not clear.

Section 33 is to be read as a whole. It provides several remedies, all predicated on "default of compliance with any order of the board when the same shall become effective." The first is a penalty of $100 per day * * * to be recovered by an action of debt, not "by the state" but "in the name of the state." The others are aimed at enforcing observance of the orders of the board, *i. e.,* (2) *mandamus,* (3) injunction, (4) suit in equity as for specific performance. All four look to one object, viz., compelling obedience to the order. We do not think it is suggested that the attorney-general, rather than the counsel for the board, should conduct either form of equity proceeding mentioned in section 33, and Vice-Chancellor Backes, in *Board* v. *Sheldon,* 95 *N. J. Eq.* 408, 411, in a suit for injunction against unlawful operation of jitney buses, remarked that "the jurisdiction of equity to protect the rights of the state is one of common exercise, usually upon the relation of the attorney-general. But where, as here, the duty of protecting the public interest as against the unlawful operation of public utility jitneys is vested by the state in the board, the authority to vindicate the public right is conferred by necessary implication, if not by express terms, and the functions of the attorney-general are be-

stowed." This view, which we deem to be sound, is applicable also to the remedy by *mandamus;* and section 33, and other portions of the act, such as section 38, providing for review of orders by *certiorari* or petition, section 40, speaking of court proceedings "directly affecting an order of the board or to which the board is a party," section 37, referring to "any right of action by the board" coupled with the authority to employ counsel and fix his compensation, seems to point clearly to a general scheme of delegation of the state's power over public utilities to this great state agency, intrusting to it the power and imposing on it the responsibilty of taking action in the courts to defend its mandates against legal attack, and to enforce them by the appropriate proceedings indicated in section 33. The commissioner seems to have been of the opinion that assuming the propriety of counsel for the board conducting suits in equity and for *mandamus,* his power did not extend to bringing on behalf of the board "an action of debt in the name of the state" for the penalty of $100 per day. We are unable to concur in this view, which we consider a faulty construction of the statute, and one calculated to throw the whole legislative scheme into confusion. We think it has been shown that the common law powers and duties of the attorney-general may be, and in important particulars have been enlarged, diminished, modified, and to a certain extent abrogated by legislative enactment; so that if, as in the case of crimes and misdemeanors in counties, the power of prosecuting may be taken away from the attorney-general and delegated to local prosecutors of the pleas, and if, for instance, as in the Insurance act of 1867 (*Pamph. L., pp.* 776, 779), the penalties were "to be sued for and collected in the name of the state by the prosecutor of the pleas for the county where the offense shall have been committed," there should be no difficulty in acknowledging the power of the legislature in erecting a public utility commission to delegate to it the power to sue in the name of the state for the penalty and to entrust the conduct of the suit to counsel authorized by the statute to be appointed. Granting the power, the question then is

whether it has been exercised; and we have no hesitation in concluding from a consideration of the whole act and particularly the relevant portions thereof, that it has been exercised, and effectively so.

It should follow from what has been said, perhaps at unnecessary length, that to the board was entrusted the power to institute suit for the penalty in the name of the state—which it has done—and that the legislature if not indeed expressly, still by plain implication has entrusted to the counsel of the board the power of conducting all suits on its behalf, including that now under consideration. The thirty-sixth and thirty-seventh defenses should therefore have been struck out as on demurrer, and it was error to refuse to strike them out.

This brings us to the other defenses upheld in the court below.

The first defense is in substance, that because of various proceedings for review of the order, its operation was suspended until it was adjudged effective by a court of last resort. This was conceded by stipulation filed in this cause, and therefore it seems unnecessary to consider its merits. By that stipulation the penalty runs from December 21st, 1928, when the United States Supreme Court delivered its decision; and is recoverable up to January 11th, 1929, when this suit was begun.

The second defense is in substance that as the order of the board required the railroad company to begin work on the crossing not later than June 1st, 1927, and that date has long since passed due to the litigation, the order became ineffective and the board should set a new date. This defense is manifestly frivolous, for if it prevail, no one can predict how long the enforcement of such new order, or a series of new orders, would be postponed by litigation respecting their efficacy. This defense should have been struck out.

The substance of the fourth defense is that the defendant is a Pennsylvania corporation, operating at the locality in question over a right of way owned by the Lehigh Valley Railroad Company of New Jersey; that the changes prescribed by the order of the board call for the closing of a

grade crossing near by and the opening of a new connecting road between Camp Lane and the state highway, and that it was the duty of the township to lay out and open the connecting road, and of the state highway commission to acquire the land needed for the widening of the state road, "before the defendant could commence any of the work required of it to be performed under said order and plan;" and that neither the township nor the highway commission has done anything in the matter.

Assuming, as we must assume on a motion tantamount to a demurrer, that the facts are truly stated, the defense is still insufficient in law. As to closing the Camp Lane crossing and building a connecting road it might reasonably be said that neither is a condition precedent to beginning work on the new underpass. In fact, the beginning of such work would probably necessitate the early closing of the present state highway grade crossing and the diversion of all traffic to Camp Lane until the new underpass can be used. But in any event, it is noteworthy that at no point in its pleading does defendant aver any willingness to obey the order if conditions would permit. We think that a defense of this kind, to be good at law, should set up that the defendant did all that it could reasonably do to obey the order, for example, that it applied to the township for the necessary action concerning the connecting road, and that the township committee had then failed or refused to act; that it had notified the highway commission of the order and of the requirement that the additional land be procured, and that that body also failed to act. There is no allegation anywhere in the record that the defendant did one act or said one word to indicate its readiness to comply with the order or directed to such compliance. On the contrary, the record shows on its face a flat refusal to comply, evidenced by an immediate legal attack on the order persisted in during a course of litigation over a period of months. The fourth defense is legally insufficient as attempting to plead an excuse for disobedience without any averment of a willingness to obey. 1 *Chit. Pl.* *358.

The case, then, stands thus; all the defenses except those

discussed were struck out, and defendant has acquiesced in that ruling by not taking any cross appeal. The first, fourth, thirty-sixth and thirty-seventh should have been struck out. If this had been done, a judgment would have gone for the board, in the name and for the benefit of the state, for two thousand dollars, penalty accrued for twenty days at the time of commencing suit. Such a judgment should now go.

The judgment under review is reversed with costs, and the record remanded to the Supreme Court to the end that that court enter judgment for the plaintiff in the amount stated.

*For affirmance*—THE CHANCELLOR, TRENCHARD, JJ. 2.

*For reversal*—THE CHIEF JUSTICE, PARKER, KALISCH, BLACK, CAMPBELL, LLOYD, BODINE, VAN BUSKIRK, KAYS, HETFIELD, DEAR, JJ. 11.