DARLING APARTMENT COMPANY,
Complainant Below, Appellant,

*vs.*

WILLARD SPRINGER, JR., Constituting the Delaware Liquor Commission,
Defendant Below, Appellee.

*Supreme Court, On Appeal, October 28, 1941.*

422

LAYTON, C. J., and RICHARDS, RODNEY, SPEAKMAN, and TERRY, JJ., sitting.

*William H. Bennethum,* of the office of Marvel & Morford, for plaintiff in error.

*William S. Potter,* for defendant in error.

*James R. Morford,* Attorney General, in support of motion.

LAYTON, Chief Justice, delivering the majority opinion of the Court:

Darling Apartment Company operates a hotel in the City of Wilmington. In 1940 it was the holder of a license granted by the Delaware Liquor Commission to sell alcoholic liquors for consumption on its premises. It was notified

that its license would be suspended for a stated period because of violation of a regulation adopted and promulgated by the Commission; and it sought to enjoin the enforcement of the order of suspension. A demurrer to its bill of complaint was sustained *(ante p. 98)*; it elected to take final judgment; an order dismissing the bill was entered; and this writ of error was sued out.

The Delaware Liquor Commission was establed and its authority defined by *Chapter* 18, *Volume* 38, *Delaware Laws,* entitled, "An Act creating a Commission for the Control of the Manufacture, Distribution, Sale and Transportation of Alcoholic Liquor, Wines and Beer." With certain amendments the Act appears in the *Revised Code of 1935* as *Chapter* 176.

By *Section* 5 of the Act *(Rev. Code,* § 6134) the Commission is authorized to adopt and promulgate rules and regulations having the force and effect of law, and specifically, "to establish by such rules and regulations an effective control of the business of manufacture, sale, dispensation, distribution and importation of 'alcoholic liquors' within and into the State of Delaware, including the time, place and manner in which 'alcoholic liquors' shall be sold and dispensed, not inconsistent with the provisions of this Chapter."

By *Section* 33 *(Rev. Code,* § 6162) the holder of a license for the sale of alcoholic liquors in a hotel, restaurant, club or tavern is forbidden to sell them between twelve o'clock midnight of any day and nine o'clock in the forenoon of the following day, except in certain stated circumstances.

Rule 79, for the violation of which the suspensive order was made, provided as follows:

"It is forbidden for any holder of a license for the sale of 'alcoholic liquor' other than the holder of a 'Gathering License' to knowingly permit the consumption of any 'alcoholic liquor' on the premises to which such license pertains between 12:30 o'clock in the forenoon and 9:00 o'clock in the forenoon except on the first day of January in each year * * *."

By *Section* 29 (*Rev. Code,* § 6158) the Commission may cancel or suspend any license for the sale of alcoholic liquor "if it has reasonable ground to believe: * * * That the licensee has violated" any provision of the Act or any regulation of the Commission.

It is first contended that the Commission exceeded its authority in adopting the rule for the reason that the act nowhere refers to the consumption of alcoholic liquor; and as the statute specifically recognizes the right of the licensee to sell alcoholic liquors until midnight and does not purport to regulate its consumption, the Legislature has manifested its intent not to legislate with respect to consumption of liquors legally sold, and, therefore, the regulation was outside the scope of the rule making power.

The plausibility of the argument disappears when the purpose and language of the act and the practical aspects of the traffic in alcoholic liquors are considered. The Legislature authorized the Commission to establish by rules and regulations an effective control over the sale of alcoholic liquors. It expressly provided that no sale should be made after midnight. It is true that the act does not purport to control the consumption after midnight of legally sold alcoholic liquors. But when consumption is viewed with the statutory deadline for sale, the co-relation and importance of the time limitation for the drinking of liquors legally purchased are at once discoverable; for where alcoholic liquors are authorized to be sold for consumption on the licensed premises the consumption of them is so directly and intimately related to the sale that both aspects of the traffic may reasonably be regarded as one transaction. The provision of the rule that forbids the licensee knowingly to permit alcoholic liquors to be consumed on the premises after 12:30 A. M., effectively lessens the likelihood of their purchase after midnight, and at the same time permits an adequate time for the consumption in a reasonable amount of liquors bought before midnight. Other considerations

affecting the general welfare are apparent. The argument needs no elaboration. The rule is not void as one without the scope of the power delegated.

It is next contended that the grant of authority to the Commission to establish by regulations an effective control of the liquor traffic is an unlawful delegation of legislative power which is vested in the two legislative houses by *Section* 1 of *Article* II of the *Constitution* of this State, for the reason that the power and discretion of the Commission is undefined and unconfined by any legislative standard.

The cardinal principle to be observed by legislatures in the grant of authority to administrative bodies to make rules and regulations having the effect of law is, that there must be found in the law itself a reasonably clear formula by which the grantee of the power must be governed. Whether the act, in all of its aspects, is invulnerable against attack on this score, is not of present concern. The immediate question has to do with the hours of the day within which alcoholic liquors may not be sold; and in this respect the Legislature has unmistakably established the law. Alcoholic liquors, except in certain cases, cannot be sold legally between midnight and nine o'clock A. M. As to this the Commission was given no authority whatever. The power granted to the administrative commission was not a roving commission to exercise its discretion without restraint or limitation, and at its will to fix the hours within which alcoholic liquor might be sold; rather the power is circumscribed and limited to the making of rules and regulations whereby the established law for lawful sale might be effectively maintained. The act in this respect is not violative of the constitutional provision.

*State v. Retowski*, 6 *W. W. Harr.* 330, 175 *A.* 325, and *Hoff v. State*, 9 *W. W. Harr.* 134, 197 *A.* 75, are cited by the plaintiff in error in support of its contentions. These cases are of value here only for their correct statements of principles by which legislative and administrative bodies are

controlled in the grant and exercise of the rule making power. They are inapposite because of their factual backgrounds.

It is next contended that the act makes no adequate provisions for publication and due notice of the adoption and promulgation of the rules and regulations by the Commission, and that, on this account and in this respect, it is unconstitutional. This question was not raised by the bill of complaint, and, accordingly, was not considered by the court below. It is not properly before this court, and will not be determined. But with the hope that some useful purpose will be served, we note in *Section* 5 of the act there is no provision whatever for the publication of rules and regulations adopted thereunder. By *Section* 8 *(Rev. Code,* § 6137) it is provided that the "Commission may make any regulation it may deem necessary for the carrying out of this Chapter respecting its internal economy and the conduct of its business. * * * Such regulations must be published in form open to public inspection at the office of the Commission." This language is vague and equivocal, but it is unnecessary to determine whether it was intended to relate to the publication of rules and regulations authorized under *Section* 5.

It is contended that *Section* 29 of the act authorizing the cancellation or suspension of licenses on reasonable cause for belief of violation of the act or regulation is unconstitutional because no right of appeal to a court of competent jurisdiction is afforded. The argument is elaborated by pointing out that even notice of alleged violation and a hearing of charges are not required; and it is said that such situation is intolerable and unknown to our concept of government.

This contention is basically unsound. It may be admitted that the exercise of the power of revocation or suspension only after notice and hearing would better comport with the general conception of a proper procedure. Any

summary exercise of power may be regarded as harsh; but the question is one of legislative power, not of propriety. The precise nature of a license to sell alcoholic liquors must be held in mind. From very early times governments have recognized the evil effects of indulgence in intoxicating liquors and have imposed restrictions on their use. Traffic in them is generally regarded as not essential to the welfare of society, and while, either through human frailty or perversity, preclusion has been found wanting, yet the business has always been looked upon as a definite source of evil to the public, rigidly to be controlled in the interest of the general welfare. Moreover, it is well known that convictions for the violation of laws and regulations are often difficult although the public authorities may be well convinced.

A license to sell alcoholic liquor is not property in any legal or constitutional sense; no right arising from a contractual relationship is conferred on the licensee. It is a mere temporary permit issued under the authority of the state in the exercise of its police power to do that which otherwise would be unlawful. The right of the licensee can rise no higher than the terms of the law under which the license is issued; and the licensee accepts the privilege subject to such conditions, including the cause and manner of revocation or suspension as the Legislature may see fit to impose. Where the statute or ordinance provides a method of revocation or suspension, that course must necessarily be followed; but if, by express terms or by necessary implication, no notice and hearing of charges are required, and a summary power is vested in an administrative body, the licensee, by his acceptance of the license, is bound by and is subject to the condition.

The act, in terms, makes no provision whatever for notice, hearing or appeal. On examination it is found that the Commission is required to hold hearings only where at least ten residents in the neighborhood have by petition complained with respect to the appointments of or the conduct

of business in a licensed establishment (*Rev. Code*, § 6134, (10) ; and in the case where ten property owners living in the area of the license have protested its issuance (*Rev. Code*, § 6150, *as amended by Ch.* 188, *Vol.* 42, *Del.* *Laws*).

The Legislature was careful to provide for the remission to the licensee of that part of the license fee pertaining to the unexpired term of the license, and for the remission to him of the amount originally received by the Commission from the licensee in payment for alcoholic liquors required to be seized, if the license be cancelled. (*Rev. Code*, § 6158, *as amended by Ch.* 189, *Vol.* 42, *Del. Laws*).

Neither by express language nor by compelling implication does it appear that the Legislature conditioned the power of revocation or suspension on notice and hearing of charges. On the contrary, it is sufficiently clear that it was intended to confer on the Commission a summary authority based on reasonable cause for belief, which is no more than the existence of facts and circumstances sufficiently strong to warrant belief in the mind of a reasonable man.

It must be presumed that the Commission will not act capriciously or maliciously. Summary action is often regarded as necessary in matters affecting the public health and morals; and it may be supposed that the Legislature conferred the summary power of cancellation and suspension after a balancing of considerations of the public welfare with possible cases of unfairness and injustices to the licensees.

The authority of the Commission is clearly administrative, not judicial. No legal or constitutional right is invaded by the summary exercise of the power. It follows that the licensee has no constitutional cause for complaint in that no right of appeal to a competent court is conferred by the act. 21 *A. & E. Ency. Law*, 826; 37 *C. J.* 248; 2 *Am. Jur.* 857; *Black, Intoxicating Liquors*, § 194; 33 *Am. Jur.* 382, 383; *In re Grant*, 44 *Utah*, 386, 140 *P.* 226, *Ann. Cas.* 1917A,

1019, *annotation* 1024; *Com. v. Kinsley*, 133 *Mass.* 578; *Burgess v. Mayor of City of Brockton*, 235 *Mass.* 95, 126 *N. E.* 456; *Stone v. Fritts*, 169 *Ind.* 361, 82 *N. E.* 792, 15 *L. R. A.* (*N. S.*) 1147, 14 *Ann. Cas.* 295; *People ex rel. Lodes v. Health Department*, 189 *N. Y.* 187, 82 *N. E.* 187, 13 *L. R. A.* (*N. S.*) 894; *Wallace v. Mayor, etc., of City of Reno*, 27 *Nev.* 71, 73 *P.* 528, 63 *L. R. A.* 337, 103 *Am. St. Rep.* 747; *Child v. Bemus*, 17 *R. I.* 230, 21 *A.* 539, 12 *L. R. A.* 57; *Grand Rapids v. Braudy*, 105 *Mich.* 670, 64 *N. W.* 29, 32 *L. R. A.* 116, 55 *Am. St. Rep.* 472.

*Section* 4 of the act (*Rev. Code*, § 6133) in part, is as follows:

"A Commission is hereby created under the name of the 'Delaware Liquor Commission.' The said Commission shall consist of only one (1) member who shall be appointed by the Governor of the State of Delaware. Said member to be appointed by the Governor on or before the fifteenth day of May, A. D. 1933 to serve for the period of five (5) years from the day of the date of said appointment. * * *

"The member appointed to said Commission by the Governor may be reappointed to succeed himself. * * *

"Should the member herein appointed to said Commission die or resign before completing the term to which he was appointed the Governor shall appoint a member to fill said unexpired term."

And it was provided generally that the manufacture and sale of alcoholic liquor shall be regulated under the act and by the Commission so long as such manufacture and sale shall be permitted in the several counties under the Local Option provisions of the Constitution.

It is contended that the rules and order of the Commission are void, for the reason that the present Commissioner is not the original appointee, and that the act nowhere provides for the appointment of a Commissioner, other than the original appointee, to serve after the termination of the five year period.

The basis of this contention seems to be that, through oversight, the Legislature omitted to provide for the continuation of the Commission beyond the term of the original

appointee, and that the language of the act is so plain and unambiguous, and its meaning so clear and unmistakable, that the *casus omissus* cannot be cured under the guise of construction. There is no merit in this contention. It is expressly provided that "the member appointed to said Commission by the Governor may be reappointed to succeed himself." Mere cavil apart, some other person may be appointed to succeed the member first appointed. But even if the language of the section were so uncertain and ambiguous as to require construction, the result would not be doubtful, for the primary rule of construction is that the legislative intent, if it can be ascertained from the language employed, must control *Coleman v. Rhodes*, 5 *W. W. Harr.* 120, 159 *A.* 649. There is every evidence in the act itself that the Legislature intended to establish a permanent system of control of the traffic in alcoholic liquors, of which system the Commission is a necessary part. Legislative language is not given a strictly literal meaning when it is apparent from competent evidence that the Legislature had no such meaning in mind. *Nigro v. Flinn*, 8 *W. W. Harr.* 368, 192 *A.* 685. Courts are not compelled to follow the letter of a statute when it departs from the true intent and purpose and to conclusions inconsistent with the general purpose of the act. *Harlee v. Federal Finance Corp.*, 4 *W. W. Harr.* 345, 152 *A.* 596; and they are obliged to give to the language of a statute a plain and sensible meaning having in mind its purpose and intent. *Petition of Hoopes*, 1 *Terry* (40 *Del.*) 126, 5 *A.* 2d 655.

The defendant in error lawfully constitutes the Delaware Liquor Commission.

One other question remains to be considered. In the court below the Commission was represented by counsel appointed under the supposed authority of the act, the Attorney General offering no objection. In this court, however, the Attorney General moved to strike the appearance of the Commisison's counsel and to substitute his own. Two reasons are advanced. First, it is contended that the office

of Attorney General is a constitutional office the substance of which are the powers and duties incident thereto at common law; and as the Legislature may not abolish the office itself, it is without power to effect a piecemeal emasculation of the office by taking from it its substance and transfer it to another appointed in a different manner and under a different tenure. See argument in *State v. Morris*, 1 *Houst, Cr. Cas.* 124, citing *Warner v. People*, 2 *Denio* (*N. Y.*) 272, 43 *Am. Dec.* 740. The second contention is that the statute confers no authority on the Commission to appoint its own law officer to represent the State.

The defendant in error, seemingly, admits that, by implication, there is some constitutional restriction on the power of the Legislature to trench upon the common law powers and duties of the office of Attorney General, but asserts that the Legislature, to which is left the residuum of power, may authorize administrative agencies of the State having no common law function or duty to appoint counsel who may act independently and not under the control of the Attorney General. 7 *C. J. S., Attorney General,* § 8, *p.* 1229; *Board of Public Utility Commissioners v. Lehigh Valley R. R. Co.*, 106 *N. J. L.* 411, 149 *A.* 263; *People v. Santa Clara Lumber Co.*, 126 *App. Div.* 616, 110 *N. Y. S.* 280; *State v. Hall*, 23 *N. M.* 422, 168 *P.* 715.

The precedent question is one of statutory construction not of legislative power; and this requires a brief consideration of the nature of the office of Attorney General at common law.

In England the office is of ancient origin. It was vested by the common law with a great variety of duties. The Attorney General was the law officer of the Crown, and its only legal representative in the courts. 2 *Thornton, Attorneys at Law*, 1131; 5 *Am. Jur.* 234; 11 *Ill. Law Rev.* 394; *Rex v. Austin*, 9 *Price* 142; *Attorney General v. Brown*, 1 *Swanst.* 294; *Rex. v. Wilkes*, 4 *Burrows* 2570. We derive our system of jurisprudence from England, and we adopted

the office of Attorney General as it existed in England as a part of the governmental machinery necessary for the protection of public rights and the enforcement of public duties by proper proceedings in courts of justice. The powers and duties of the office of Attorney General are so numerous and varied that neither the framers of our several constitutions nor the legislatures have ever undertaken exhaustively to enumerate them, and where not defined by statute those powers and duties must be sought for in the common law. *State v. Valent*, 3 *W. W. Harr.* 399, 138 *A.* 640. The authorities substantially agree that, in addition to those conferred on it by statute, the office is clothed with all of the powers and duties pertaining thereto at common law; and, as the chief law officer of the State, the Attorney General, in the absence of express legislative restriction to the contrary, may exercise all such power and authority as the public interests may from time to time require. In short, the Attorney General's powers are as broad as the common law unless restricted or modified by statute. 7 *C. J. S., Attorney General*, § 8, *p.* 1226; 5 *Am. Jur.* 235; 2 *Thornton, Attorneys at Law*, 1149; *Withee v. Lane & Libby Fisheries Co.*, 120 *Me.* 121, 113 *A.* 22; *State v. Finch*, 128 *Kan.* 665, 280 *P.* 910, 66 *A. L. R.* 1369; *Hunt v. Chicago, etc., Ry. Co.*, 121 *Ill.* 638, 13 *N. E.* 176; *State ex rel. Ford v. Young*, 54 *Mont.* 401, 170 *P.* 947; *People v. Miner*, 2 *Lans., N. Y.* 396, 399.

From the earliest times in this State the Attorney General, whether appointed or elected, has been looked upon as well by the Bar as by the intelligent laity as the State's law officer, clothed not only with the power but also the duty to represent the State and its several departments in all litigation where the public interests are concerned, and to advise the Executive and other State officers and agencies when called on by them for legal advice in their official capacities. Many powers and duties in respect of matters and subjects unknown to the common law have been expressly lodged in the office by statute; and more often, perhaps, in the creation of state agencies, the Legislature has tactily

recognized the Attorney General as the State's legal representative. So generally has this conception of the office prevailed that there have been but two instances of legislative interference with the office. In 1863, by *Chapter* 321, *Volume* 12, *Delaware Laws,* the Legislature declared it to be the official duty of the Attorney General to enforce a certain lottery statute; and it proceeded to name two members of the Bar to prepare indictments on behalf of the State against violators of the act, unless the Attorney General should submit indictments against them within a stated time. This was held to be beyond the power of the Legislature. The second instance is to be found in *Chapter* 258, *Volume* 41, *Delaware Laws,* approved April 30, 1937. By *Section* 17(*a*) of that act, it is provided that:

"In any civil action to enforce the provisions of this Act the Commission and the State may be represented by any qualified attorney who is employed by the Commission and is designated by him for this purpose or at the Commission's request by the Attorney General."

The language of the statute relied on here as authority in the Delaware Liquor Commission to appoint its own law officer in derogation of the prerogative of the Attorney General to represent the State agency in the courts must be considered in the light of the office at common law, and of our general understanding of the nature of the office and the public policy in regard thereto exhibited through the years.

*Section* 5(9) of the Act (*Rev. Code,* § 6134(9) authorizes the Commission:

"To appoint or employ every officer or employee necessary for the carrying out of the work of the Commission and dismiss them for cause, fix their salaries or remunerations, and assign them their official titles and duties, *and to engage the services of experts and of persons engaged in the practice of a profession.* * * *." (Italics supplied.)

It is not claimed that counsel independent of the Attorney General is an officer or employee necessary for the carrying out of the work of the Commission. It is under the italicized language of the paragraph, giving general and unde-

fined authority to engage the services of experts and those practicing a profession, that the authority is asserted; and upon this entirely equivocal language reliance is placed for the power to appoint a law officer independent of the Attorney General to represent the State in the courts. The act does not mention "counsel," "attorney," "actions," nor does the language suggest legal representation of any kind; while in the cases cited by the defendant in error the statutes expressly authorized the appointment of "counsel" or "special counsel" by the administrative bodies. Holding in mind the accepted principle that, in the absence of express legislative restriction, the Attorney General, as the chief law officer of the State, may exercise all of the powers and authority incident to the office at common law, it is manifest that there is nothing in the act as a whole, nor in the particular language relied on, which, either expressly or by any reasonable intendment, indicates the legislative purpose to empower the Commission to appoint its own law officer to represent the State in judicial proceedings. The language is not apt for the purpose. It is entirely consonant with the powers and duties of the Commission as an administrative body. The right of a mere administrative agency of the State to appoint its own law officer to conduct litigation in supersession of the Attorney General, and to charge the public with the incidental expense, must rest on a plain and unambiguous grant of authority. It necessarily follows that the Attorney General has the power, and it is his duty, to represent the Commission in all judicial proceedings.

We are not disposed, however, to grant the Attorney General's motion to strike the appearance of the Commission's counsel. We note the argument of the defendant in error and the citation of authorities holding that the question of want of authority of an attorney in a case cannot be raised by an objection first made in an appellate court. 4 *C. J. S., Appeal and Error*, § 254, *p.* 501; *People v. Denison*, 17 *Wend.*, N. Y., 312; *In re People by Beha*, 231 *App. Div.* 303, 247 *N. Y. S.* 160. We note also the contention of

the Attorney General that the authorities cited are without point for the reason that here the objection is made, not by a mere party, but by the Attorney General himself as a constitutional officer. But no question of jurisdiction is involved; and it is sufficient to say that in this court, in the precise circumstances shown, the Attorney General is in no position to insist upon his prerogative.

The decree of the Chancellor is affirmed.

RODNEY, Judge, concurring:

I am in entire concurrence with the opinion in this case. In view of the fact, however, that my own investigation as to the office of Attorney General had proceeded on lines slightly differing from those heretofore expressed, I have concluded it may not be inappropriate that the result of this investigation be set forth, even at the expense of desirable brevity.

I conceive there are two questions for consideration:

(1)   Whether or not the rights, if any, of the Attorney General have been waived by his failure to interpose, in the court below, any objection to the representation of the Delaware Liquor Commission by counsel of its own selection, and the making of such objection for the first time in the Supreme Court.

(2)   A consideration of the broad question of the powers of the Attorney General in Delaware. Included in this question is the discussion of the power of the Legislature to enact statutory legislation granting to a State agency authority to select legal representatives, and, secondly, whether the Legislature has aptly granted such authority.

The interest and importance of the second question prompts its primary consideration.

Any rational discussion of the powers of the Attorney General in Delaware must include (a) the powers and duties appertaining to the office of Attorney General as it existed at common law, (b) how those powers have been

considered in other American jurisdictions following our separation from England, and (c) the manner of construction of these powers in connection with the Constitution, statutes or polity of the State of Delaware.

(a)   It would avail but little to enter upon any prolonged discussion of the obscure origin and the development of the office of Attorney General as it existed in England. Any such effort would be the mere restatement of the conclusions arrived at by legal historians better qualified for the task.  From Bellot "The origin of Attorney General" 25 *Law Quarterly* 400, and 6 *Holdsworth "History of English Law"* one gathers that originally the King had a number of attorneys appointed by letters patent describing their duties and the area and courts as to which their authority extended: that gradually it became the tendency to supersede these attorneys by the appointment of a single attorney with power to appoint deputies.  King's Sergeants had their origin in the desire that the Crown should be represented in litigation, and the question of primacy between the King's Sergeants and the Attorney General was of slow development.  *Blackstone* (*Vol.* 3, *p.* 27) states that the King's Premier Sergeant was entitled to precedence, and *Holdsworth* (*Vol.* 6, *p.* 471) states that the Attorney General had much the same powers as the King's Sergeants.  It is there intimated that the Sergeants were persons solely concerned with the law, but that upon the restoration of the Stuart Dynasty the requirements of the sovereign necessitated that he obtain from the Attorney General not merely legal aid, but political and personal advice as well, and that with membership in Parliament the primacy of the Attorney General as the chief law officer became established.  It seems certain that the Attorney General became the chief law officer of the British Crown and that the office, *eo nominee,* became known in most American states.

(b)   It is material, of course, to see in what manner other jurisdictions have considered the powers and duties of the Attorney General. It is only possible to bring some

measure of order from the maze and chaos of conflicting opinions by dividing the jurisdictions into certain general groups depending upon the constitutional provisions concerning the office, and the recognition accorded the common law status of the office. Even this course is most unsatisfactory.

States like Indiana and Oregon seem to have no constitutional provisions concerning the Attorney General. Oregon seems to recognize the common law duties of the office, and Indiana does not.

Another group of upwards of fourteen states provide in their Constitution for an Attorney General whose duties "shall be such as are prescribed by law." Some nine of these states subscribe to the common law powers and duties, and five jurisdictions do not.

A number of other states, like our own, merely provide in their constitutions for an Attorney General, but make no mention of the duties of the office. These States include Iowa, Kansas, Massachusetts, Mississippi, New Hampshire, New Jersey, New Mexico and Pennsylvania, and possibly others. Of these States Iowa and New Mexico refuse to recognize the common law status of the Attorney General. Most of the others recognize such powers, and Mississippi has decisions both ways. Decisions like *Board of Public Utility Commissioners v. Lehigh Valley R. R. Co.*, 106 *N. J. L.* 411, 149 *A.* 263, and *Com. ex rel. Minerd v. Margiotti*, 325 *Pa.* 17, 188 *A.* 524, strongly present the law in those jurisdictions. In New York the lower courts in a number of cases have considered the powers and duties of the Attorney General, and concluded that these powers and duties were of common law origin. These cases include: *People v. Miner*, 2 *Lans.* 396; *People v. Kramer*, 33 *Misc.* 209, 68 *N. Y. S.* 383; *People v. Santa Clara Lumber Co.*, 55 *Misc.* 507, 106 *N. Y. S.* 624. The same State in the only appellate decision of *Ward Baking Co. v. Western Union Telegraph Co.*, 205 *App. Div.* 723, 200 *N. Y. S.* 865, seems to express some doubt

as to the question, especially as to criminal investigations. Articles of interest as to common law powers and duties of the Attorney General may be found in 16 *N. C. Law Review*, 282, and 25 *Journal of Criminal Law*, 358.

A general view of the authorities in other jurisdictions plainly indicates that the great majority hold that the office of Attorney General was vested with certain common law powers and duties which still exist, except as modified by statute.

(c) There then remains to be considered the construction that must be given to the powers of the Attorney General under the Constitution, statutes and polity of the State of Delaware. A short historical account may not be inappropriate.

In March, 1681, William Penn received a Royal Charter for all the land that now constitutes the State of Pennsylvania. This Charter provided for all the details of government, including the appointment of officers, and other matters of administration. This Charter did not cover or embrace the counties of New Castle, Kent and Sussex, then known as "The Three Lower Counties," and now constituting the State of Delaware.

The last mentioned counties had been claimed by and were under the government of the King's brother, James, Duke of York. For them no Royal Charter had been given. In August, 1682, the Duke of York made a deed to Penn for these Three Lower Counties. In it there was no mention of any right of government, appointment of officers, or any other matters of administration. The deed did not emanate from the Crown, but from the Duke of York. In October, 1682, the then three counties of Pennsylvania were joined with the Three Lower Counties by an Act of Union, and were governed from 1682 until 1703 by one Assembly, composed of representatives from each county.

On October 25, 1683, is the first reference to an Attorney General. On that date John White was "made Attorney

General to plead the cause between" the Governor and two named individuals. Others were subsequently named, and on April 14, 1686, Joshua Barkstead was commissioned as Attorney General for the County of Sussex, and John Bradshaw as Attorney General for Kent County. It may appear from this that there was a prosecuting officer in each county, who was called Attorney General.

In 1703 the Three Lower Counties, now constituting the State of Delaware, entirely separated from the Province of Pennsylvania, established their own Assembly, and never afterwards joined the Province in legislation. The only common bond was that the same Governor, under the Penns, acted, by approval of the Crown, for the Lower Counties as well as for the Province of Pennsylvania.

It is not clear who, if anyone, acted as Attorney General for the Delaware counties during the first twenty years of their separation. On November 7, 1723, Governor Keith commissioned David French to be Attorney General. He was given full power to implead and prosecute all criminal offenses and "to commence and prosecute all other matters, suits and actions whatsoever in any Courts of law or Equity within the counties aforesaid wherein our Sovereign Lord the King, his Lieutenant and Deputy Lieutenant Governor for the time being of his Majesties Government are or shall be concerned."

The Commission was operative solely during the pleasure of the Governor. French is the first known Attorney General appointed exclusively for what is now the State of Delaware, and from 1723 until after the Revolutionary War he, with William Shaw, John Ross, Samuel Chew, George Read and Jacob Moore occupied the office of Attorney General. Little of their activities, other than the prosecution of criminal cases, has come down to us, although there is at least one instance, in 1739, of the rendition of a written opinion to the Governor, and between 1758 and 1772 at least

three bills in Chancery were filed by the Attorney General, for enforcing and setting up a charity.

In September, 1776, the first Constitution of Delaware was adopted. By Article 12 the office of Attorney General was mentioned by name, but with no specification of powers or duties, but with a term of five years. The appointment to the office was placed in the Governor and Privy Council, duly provided for. The Constitutions of 1792 and 1831 again mentioned the office of Attorney General with no specification of powers or duties, but placed the appointment with the Governor, alone. The present Constitution of 1897 again mentioned the office without mention of powers or duties, but reduced the term of office to four years, and made the office elective.

Now in order to ascertain what powers and duties inhere in this constitutional office of Attorney General, and what authority the General Assembly possesses with regard to these powers and duties, it is material, I assume, to consider the status when the office first became a constitutional one. For this purpose we return to the Constitution of 1776.

In the Constitution of 1776 the office of Attorney General is named, together with a number of other officers, without any specification of powers and duties. Now either these offices had some powers and duties attached to them or they were empty shells with no powers and duties at all. Some of the offices had no counterpart, in name at least, at the common law. The office of Attorney General had, and the office had been well known in the Colony. Did the framers of the first Constitution contemplate that those offices which had had no counterpart at the common law should have as appertaining to them those clear and certain powers known to the framers of the Constitution and to the people, and that other offices, like that of Attorney General, also mentioned by name only, should embrace, solely by reason of that name, powers unknown to the people and only discoverable in the distant common law? I think that when the

framers of the Constitution created an office by name only they had reference to that office with those generally recognized legal powers, duties and functions belonging to the office in the jurisdiction in which the Constitution was to operate and at the time of the adoption of the Constitution.

In *People v. Miner, 2 Lans., N. Y.,* 396, certain common law powers of the Attorney General were set out. These included criminal prosecutions; actions by *scire facias, quo warranto and mandamus* to revoke forfeited grants, inquire into the title of an office, or compel the admission of an officer to an office. They are stated to have included proceedings to enforce trusts and prevent nuisances, recover property for the Crown, and protect lunatics and certain other persons under disability. Whether all these powers were exercised by the Attorney General here in Delaware it is not necessary to determine. It is certain that some were, and it may be that all these powers were exercised or understood. We are not primarily concerned with the exact list of powers and duties appertaining to the office of Attorney General, but rather with the question as to any authority in the Legislature to make some change in these, so-called, inherent powers, even though remotely derived from the common law.

*Article 25 of the Constitution of 1776 says:*

"The common law of England, as well as so much of the statute law as has been heretofore adopted in practice in this State, shall remain in force, unless they shall be altered by a future law of the legislature * * *."

It would seem that no common law was ever adopted in this State, except such as might be altered by a future law of the Legislature. Nor could it well be. The common law is largely founded on custom long acquiesced in or sanctioned by immemorial usage. It always bends and gives way to express statutory enactment intended to be in direct opposition. The common law powers inhering to an office are, at most, a part of the common law, and can rise no higher than their source.

Now let us see for a moment from what source the common law powers of the Attorney General were derived. Since he was always appointed and removed at the pleasure of the Sovereign, then at that pleasure the powers and duties could, by commission or patent, be increased or diminished. So it was with our Colonial Governors who had power to appoint and revoke the appointment at pleasure and to indicate the powers and duties pursuant to that appointment. The indication of powers was a prerogative of the Crown. Upon the dissolution of the relationship between Great Britain and the inhabitants of this Colony the prerogatives of the Crown or of the Colonial Governors were vested in the people themselves. The people, except as expressly restrained by their own Constitution, act through the Legislature. The powers of the Legislature to employ its own counsel has never been questioned, but it is denied that the Legislature can create a state agency and authorize it to appoint counsel.

I am of the opinion that the Attorney General is the chief law officer of the State, clothed, except as altered by the Constitution or by legislation, with the powers and duties, criminal and civil, which inhered to that office when it first became a constitutional one.

I am equally of the opinion that the General Assembly, holding, except as restricted by the Constitution, the residuum of power and, as *"parens patriae,"* the prerogatives of sovereignty, can add to or subtract from the common law powers of the Attorney General, to the same extent as the Sovereign could have done before the State came into being, and when the powers were created by or acquiesced in by the Sovereign. If this were not true, then much legislation concerning sheriffs, coroners and other constitutional officers of common law origin, whose duties are not expressly defined, would suffer from the same taint. Thus could be brought into question much legislation enacted through the century and a half of the State's existence, touching the

care and custody of prisoners and the manner of selecting juries, and countless other modifications of common law duties of an officer, where merely the name of the office was carried into the Constitution. Thus as of 1776, when the first Constitution was adopted, would be crystallized many of the most important relations of society, and the people, through the legislative branch, could neither make needed and desirable improvements nor, possibly, even correct abuses.

It is upon the basis here suggested that local prosecuting officers have, in larger states, been carved out of the office of Attorney General. While the Attorney General normally has control of litigation in which the State is interested, yet the State itself must of necessity be the ultimate arbiter of such litigation. Almost all of the States, with the exception of Illinois, concede the powers of the Legislature by express action to lessen the common law powers of the Attorney General. That State alone denies to the Legislature authority to modify the common law powers of the Attorney General, under a constitutional provision that the powers of the Attorney General should be such as "may be prescribed by law." The Delaware case of *State v. Morris*, 1 *Houst. Cr. Cas.* 124, is not, I think, inconsistent. That case was decided in 1863, under the *Constitution of* 1832. Under that Constitution the Governor alone had the power of appointment of the Attorney General. The Legislature had appointed designated persons to entirely displace the Attorney General in certain criminal proceedings. It was upon the ground that the Attorney General was the exclusive appointee of the Governor that the case was determined by two Judges with the Chief Justice dissenting.

There then remains the question as to whether the Legislature has aptly granted the authority contended for. In the absence of legislation the authority and the duty of the Attorney General to appear in court for the State or its immediate agencies has, I think, been universally recog-

nized. If this authority is to be lessened or changed in any manner it should be done by express legislative action.

The Act in question, by *Sec.* 6134, *Revised Code,* 1935, gives to the Liquor Commission the power:

"(9) To appoint or employ every officer or employee necessary for the carrying out the work of the Commission and dismiss them for cause, fix their salaries or remunerations, and assign them their official titles and duties, and to engage the services of experts *and of persons engaged in the practice of a profession.*"

I am not prepared to say that the term "persons engaged in the practice of a profession" excludes one practicing the profession of law. The very universality of the term indicates the disinclination of the Legislature to indicate the precise professions to be covered. I am not prepared to say that a person engaged in the practice of law may not be engaged, render advice or assistance necessary in "carrying out * * * the work of the Commission."

That question is not now before us. There may be a distinction between legal service arising in the performance of routine duties in "carrying out * * * the work of the Commission" on the one hand, and the actual appearance in court as the representative of the State on the other, and when it is intended to grant the power to represent the State or one of its agencies in court, either in conjunction with or in derogation of the existing power and duty of the Attorney General, such power should be so expressed as to leave no doubt as to the intention of the Legislature.

In the present case the objection to the representation of the Liquor Commission in court by private counsel, as distinguished from the Attorney General, was first raised in this (Supreme) Court. The record discloses that the Attorney General knew of the proceeding in the court below and of the representation there by private counsel, and made no objection thereto. I think that the question of representation is one of procedure and is not jurisdictional, and not having been raised in the court below it cannot be raised for the first time in this court.