# IN RE MILES LORD, WILLIAM B. RANDALL, GEORGE M. SCOTT, AND ROBERT W. JOHNSON.

97 N. W. (2d) 287.

May 28, 1959—No. 37,852.

PER CURIAM.

This is an original proceeding commenced in this court for the purpose of investigating the professional conduct of Miles Lord, attorney general of the State of Minnesota, and the county attorneys of Hennepin, Ramsey, and Anoka Counties in connection with an alternative writ of prohibition issued out of this court on April 25, 1959, in State ex rel. Minnesota Amusement Co. v. County Board of Ramsey County Commrs. 255 Minn. 413, 96 N. W. (2d) 580.

The facts pertaining to the case in which the writ was issued are partially set forth in an opinion of this court in that case filed on May 8, 1959, in which we disposed of the legal questions involved, and an opinion filed May 13, 1959, in which we dismissed the action on the ground that the questions involved had become moot.

In order to continue our investigation and to ascertain whether statements made over radio and television and which appeared in the press were made by the attorney general or the county attorneys involved, we issued our citation for them to appear before us in order to afford an opportunity to admit or deny having made such statements or furnish information upon which they were based. The county attorneys for Hennepin, Ramsey, and Anoka Counties have appeared, and we are satisfied, after an examination of them, that, although their action was ill-advised, they acted in good faith and that any disregard of our restraining order was due to a mistake of judgment rather than to any intentional defiance of the order. As to them we find no unethical conduct that would warrant any censureship.

Acting on the advice of the governor, the attorney general has refused to appear before us. We must therefore hold that he is in default and that, by his voluntary failure to appear, he admits the truth of the statements which he was quoted to have made to the press and over the radio

and television.

■ We cannot agree that, when the attorney general appears in a legal matter pending in this court, he is acting in an executive capacity. To hold that the attorney general, when he appears in court in a legal matter, is immune from the ethical standards prescribed for other attorneys and that the court is impotent to discipline him for misconduct would reduce the court to a tool of the executive. The power of a court to exact of an attorney who represents the state the same standards of fidelity and honesty as are required of attorneys who represent private clients furnishes the main distinction between independent courts in a free society and courts that are subservient to the executive in a dictatorial form of government. In preserving the separation of powers of the three branches of government, the governor of this state has no power to clothe the attorney general with immunity from the disciplinary powers of the court when the attorney general appears in court as an attorney.

■ This investigation does not involve the acts of a member of the executive branch of government as such but involves only the conduct of an attorney in a strictly legal matter. To permit the executive to interfere with or control the disciplinary power of the court over the conduct of such attorney would destroy the separation of powers fundamental to our constitutional form of government. Admitting that the courts have no jurisdiction over the executive in the performance of executive functions, it is equally vital to our form of government that the executive shall have no power to interfere with the courts in the performance of judicial functions. The unethical or contumacious conduct of an attorney—whoever he may be—in a legal matter pending in court involves something resting entirely with the judicial branch of government. While the attorney general is a part of the executive branch of government, as an attorney he is also an officer of this court. When he appears in court in a legal matter, he is acting as an attorney. The fact that he may belong to the executive branch of the government makes it no less so. To follow the position taken by the governor and the attorney general in refusing to appear before us in this matter to its ultimate conclusion would mean that not only the attorney general but every member of his staff—whether they appear in a highway condemna-

tion matter or any other matter in which the state is interested—are equally immune from the disciplinary powers of the court. To so hold would subject the rights of every citizen of this state to the absolute power of the state—the very thing independent courts exist to prevent.

In this proceeding the attorney general is not even representing the state. He appears only as an assistant to the county attorneys in the matter in which the boards of county commissioners of the named counties, not the state, are parties. As such, he is no more acting in an executive capacity than are the county attorneys involved. Neither is he any more immune from adherence to ethical standards than they are while so acting.

It appears without dispute that on February 17, 1959, the attorney general issued an official opinion in which he stated that L. 1957, c. 501, which gave the boards of county commissioners of Hennepin and Ramsey Counties and some adjoining counties the authority to fix daylight saving time in their counties, had been suspended by the later enactment of c. 646 and that the county officials of the named counties had no authority to fix such time until July 1, 1959. Chapter 646 established daylight saving time throughout the state and imposed upon the governor the duty of fixing the time for the commencement and termination thereof. The county boards of Hennepin, Ramsey, and Anoka Counties adopted resolutions during the latter part of April 1959 fixing daylight saving time to commence on April 26, 1959. After we issued our alternative writ on April 25, which included an order to show cause why a permanent writ should not be issued and a restraining order commanding the counties involved to refrain and desist from adopting or promulgating any resolution or order establishing daylight saving time or from putting into effect any order, decree, resolution, or directive theretofore adopted or promulgated, the attorney general took it upon himself to appear publicly over the radio and television and urge upon the people of this state that the court had no right to issue its temporary order and that the counties involved could legally establish daylight saving time. In the oral argument before this court in support of a motion to quash our temporary writ and upon a hearing on the merits as to whether a permanent writ should issue, the attorney general contended that, inasmuch as the resolutions of the county boards had

been adopted before we issued our restraining order, they need do nothing but could permit the resolutions to become effective and that such inaction would be a compliance with our order. It requires little understanding of law to see that the position so taken was directly contrary to the part of our order which provided that they must desist from permitting any resolution or order adopted from becoming effective.

In the opinion of the attorney general issued on February 17, 1959, he said (Opinion Attorney General, No. 83-F):

"It is our opinion that when Chap. 501 became effective (April 18, 1957), the county board of Ramsey and Hennepin counties and the county board or governing body of any municipality in a county contiguous to Ramsey and Hennepin counties, together with the City of Duluth, were authorized to adopt a time other than standard time prescribed by § 645.07, supra. However, such authority became inoperative and suspended upon the enactment of Chap. 646 and such disability will continue until after July 1, 1959."

In a personal appearance made by Mr. Lord over KSTP on April 26, 1959, he said:

"It's clear to me that the legislature has given the metropolitan area the power of self-determination in this area and I am going to ask the court to allow them to keep this self-determination."

It is obvious by comparing the statement made in his opinion on February 17 that he took exactly the opposite position when he appeared before the public over the television on April 26.

As a result of the position taken by the attorney general, many of the state, county, and city offices began operating on daylight saving time on April 27. Business places did likewise. In his appearance over KSTP on April 26, which we have referred to above, Mr. Lord said:

"State capitol employees will report to work on daylight saving time in Ramsey County."

Some of the public offices, including some of those in the state capitol, who were unwilling to defy the court's order, remained on central standard time. It followed that much confusion resulted throughout the metropolitan area.

The illegal action of the counties involved has now become of little more than academic importance by virtue of the action of the governor in fixing the time for statewide daylight saving time, as he was required to do under L. 1957, c. 646. We are concerned here only with the propriety of the professional conduct of the attorneys who appeared in this proceeding. In order that there may be no repetition of conduct such as we have in this case, which is inconsistent with the duties and obligations of attorneys in their relationship toward the courts, this opinion is written.

■ It is elementary that one who is admitted to practice as an attorney at law is an officer of the courts, and, both by virtue of his oath of office and the customs and traditions of the legal profession, he owes to the courts the highest duty of fidelity. It is his duty to assist the court in the proper administration of justice. As such, he has no right whatsoever to defy an order of the court as long as that order stands. The attorney general gives lip service to this proposition, but his statements made over the radio and television and to the press make it apparent that he took it upon himself to decide, and so advise the public, that the court's order could be ignored with impunity because he had determined that the court had no business issuing it. Nor can he be heard to say that he did not understand this court's order.

That Mr. Lord determined it was his prerogative to decide whether the court's order need be followed or not is apparent from his statements over the radio and television. Illustrative of the many indications thereof are the following. In a statement made by a commentator over station WCCO at 10 o'clock p. m. on April 25, we find the following:

"The state attorney general and various county officials have exploded just as quickly and in fact will ignore the court order. But these county commissioners don't look upon it as ignoring the order, since their actions ordering daylight time took place under legal statutes some weeks ago and cannot be overturned. Here's the way attorney general Miles Lord phrased his part of the surprising controversy."

Thereafter in the script follows an indication of statements made by Mr. Lord but such statements have been deleted from the record and cannot now be obtained. In a news broadcast made over WCCO on

April 26, the commentator said:

"The next step comes tomorrow. Attorney General Miles Lord and the others claim the supreme court writ can't be used to deal with legislative matters."

In another broadcast on the same date over the same station, the commentator said:

"A new move may be in the offing for fast time right today, however. Attorney General Miles Lord has called a news conference for 4:30 this afternoon. * * * He and several others claim the state supreme court cannot use a writ to deal with legislative matters—and that of course was the situation that led to the hodgepodge of fast and standard time zones in our northwest area."

In a broadcast made over the same station at 7:15 p. m. on April 26, the commentator said:

"Minnesota Attorney General Miles Lord says there is nothing to prevent Hennepin, Ramsey and Anoka Counties from remaining on daylight saving time."

In a broadcast made either on the late evening of April 25 or the early part of April 26, the commentator said:

"And today Attorney General Miles Lord, trying to bring order out of the chaos, said the counties acted correctly. Lord said that not only should daylight saving time be in effect in these counties—but it is fully legal too."

That Mr. Lord must have known better is apparent from his opinion of February 17. It can hardly be assumed that an attorney in his position could not understand that part of c. 646, which, after establishing state-wide daylight saving time, provides in clear and express language the following:

"* * * no department of the state government and no county, city, town, village, or borough shall employ any other time or adopt any ordinance or order providing for the use of any other time than the standard time."

It is difficult for us to comprehend how any attorney could claim that

he could not understand this clear and express language. If he did understand it, then the only conclusion that can follow is that he was deliberately trying to mislead the people by the statements he made over the radio and television.

But aside from that, it does not lie with an attorney to determine whether this court has the power to issue an order or not. A similar situation arose in United States v. Shipp, 203 U. S. 563, 27 S. Ct. 165, 51 L. ed. 319, 8 Ann. Cas. 265. In that case the Supreme Court of the United States issued a stay order to prevent the execution of an individual who had been condemned to death for the crime of rape. After the stay order was issued, the prisoner was taken from the jail and lynched. The sheriff having custody of the prisoner was charged with conspiring with others for the purpose of lynching Johnson with intent to show contempt for the order of the court. The sheriff denied the jurisdiction of the supreme court to punish for contempt on the ground that the stay order was issued pending an appeal over which the court had no jurisdiction, because the constitutional questions alleged were frivolous and only a pretense. In holding that, irrespective of whether the court had jurisdiction, it was the duty of everyone to obey it so long as it stood, the court said (203 U. S. 573, 27 S. Ct. 166, 51 L. ed. 323, 8 Ann. Cas. 266):

"We regard this argument as unsound. It has been held, it is true, that orders made by a court having no jurisdiction to make them may be disregarded without liability to process for contempt. * * * But even if the Circuit Court had no jurisdiction to entertain Johnson's petition, and if this court had no jurisdiction of the appeal, this court, and this court alone, could decide that such was the law. It and it alone necessarily had jurisdiction to decide whether the case was properly before it. On that question, at least, it was its duty to permit argument and to take the time required for such consideration as it might need. * * * Until its judgment declining jurisdiction should be announced, it had authority from the necessity of the case to make orders to preserve the existing conditions and the subject of the petition, just as the state court was bound to refrain from further proceedings until the same time."

The same is true in the case before us. Even if we had determined that

the peremptory or final writ should not be issued on the ground that prohibition was an inappropriate remedy, this court had full authority to issue a preliminary order to show cause why such peremptory writ should not issue, and, in order to maintain the status quo until both sides of the controversy could be heard, to issue a restraining order to prevent any further action from being taken, either affirmatively or by inaction such as we have here. It was the duty of everyone to abide by that order as long as it stood, and the attorneys involved had no right to take it upon themselves to misconstrue the order and to inform the public that the court had no right to issue it; therefore that they could ignore it. That is exactly what was done here. While the attorneys involved in this proceeding give lip service to the proposition that they must abide by an order of this court, their actions were to the contrary. They now seek to justify such actions by contending that, inasmuch as the counties involved had adopted their resolutions prior to the issuance of our order, they need do nothing to prevent those resolutions from becoming effective. In other words, they take the position that inaction was a compliance with this court's order. With this we cannot agree. We think it goes without saying that the least they should have done was to advise their constituents that they must not permit their resolutions previously adopted from taking effect as long as our order stood. A similar situation arose in In re Transamerica Corp. (9 Cir.) 184 F. (2d) 319. In rejecting contentions similar to those advanced here, the court said (184 F. [2d] 321):

"* * * by their answers and arguments respondents assert that this apparent contempt of the court's order was in truth not such. They contend that the acts we sought to enjoin had been accomplished and completed when our restraining order was served * * *.

\* \* \* \* \*

"* * * The prohibition runs against the corporation and its agents, or rather against the corporation acting by its agents. And obedience to such an injunction necessarily requires that the prior orders be countermanded —that the agents be instructed not to do that which they had previously been told to do. Such a countermand, or reversal of instructions, is in no true sense the taking of affirmative action to undo action previously

taken. It is no more than an essential step in the process of obedience."

The case of International Union, etc. v. United States, 85 App. D. C. 149, 177 F. (2d) 29, involved the issuance of an injunction to restrain a strike of coal miners. The union contended it was not in contempt of court because it had not done anything to order the strike. The court held that it was no answer to a contempt proceeding that it had remained inactive and that it was its duty to advise its members to cease and desist from striking. In so holding the court said (85 App. D. C. 156, 177 F. [2d] 36):

"Appellants were not convicted for causing the walk-out. They were convicted because they deliberately failed to comply with the court's order of April 3d. That was a temporary order. It sought the resumption of mining, for the protection of the national health and safety, until the court could consider the contentions of the parties relative to a further injunction. * * *

\* \* \* \* \*

"The very narrow question thus presented is whether people must obey a temporary order of court designed to secure the orderly processes of constitutional government in a dispute of great importance, or whether a person can defy such an order. The Supreme Court held, in the other case involving these same appellants, that he who fails to obey a court order of that nature is punishable for criminal contempt. That decision governs us here.

"* * * the Union was not convicted for causing the walk-out. It was convicted because it did not exercise, or attempt to exercise, whatever powers it had to cause its members to resume work temporarily pursuant to the court's order. Quite apart from what the miners did, the Union made no attempt to direct, instruct or persuade them to return to work, and thereby it disobeyed the court's order."

In discussing this case in Land v. Dollar, 88 App. D. C. 311, 320, 190 F. (2d) 366, 375, the court said:

"* * * But we there held that, when upon the facts it was obvious that an authoritative word sincerely given by him and the Union would have been obeyed, they were guilty of contempt if the results showed that such word had not been given. The present case as thus far presented is even

clearer than that. It would appear little less than absurd to say that, if the respondents presently before us had given authoritative instructions for the transfer, the transfer would not have occurred."

In Gompers v. Bucks Stove & Range Co. 221 U. S. 418, 450, 31 S. Ct. 492, 501, 55 L. ed. 797, 809, the Supreme Court of the United States said:

"If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery."

■ Under the circumstances involved in this case, inaction was as much a defiance of this court's order as affirmative action to advise them that they could defy the order would have been. If the attorney general, in case his opinion was requested, had adhered to his original opinion written in February and the county attorneys had advised their boards of county commissioners that they could not put their resolutions into effect, it is doubtful that any difficulty would have arisen. But aside from that it was his clear duty to advise those whom he pretended to represent that it was their duty to abide by this court's order. His claim now that by doing nothing they complied with our order carries little persuasion.

■ Aside from the question of defiance of our order, there are other acts of the attorney general involved in this proceeding that we think are improper and unethical. Generally speaking, it is improper and contrary to the code of ethics under which members of the legal profession live and practice law for any attorney to publicly discuss a case in which he is or may be interested while the case is pending in this court. *It is always improper and unethical to do so when the full facts are not accurately given to the public and even more so when an attorney gives to the public opinions concerning facts and law which he knows are wrong. In that respect the attorney general of the state is under no less of an obligation than any other attorney.* Attorneys owe the court the duty to permit it to consider and decide a pending case impassionately and without being subjected to public pressure engendered by statements made by attorneys in newspapers or over radio or television which

are calculated to arouse public opinion in favor of a view such attorney may countenance.

By the very nature of things, the attorney general of this state, by virtue of his official position, stands in a favored position in obtaining the opportunity to appear over radio and television or by making statements to the press that are apt to mislead the public in its desire to procure a decision of the courts which they prefer. By the very nature of things, also, much of the public is apt to believe that such statements are true and accurate statements of both law and fact. This greater opportunity for publicity imposes upon such attorney a great obligation of self-restraint to refrain from doing anything which may cause the public to doubt the integrity of the courts or their intention to decide the case according to applicable law. It is particularly reprehensible if such public appearances are motivated by an inordinate desire for publicity or by a desire to gain political popularity by undermining confidence in the integrity and impartiality of our judicial system.

In addition to the above, there are other acts of the attorney general which we consider to have been highly improper. On Sunday, April 26, the attorney general sent a telegram to each member of this court requesting an early hearing of a motion to quash our temporary writ. At that time the motion had not been filed with us. On the same day he appeared over KSTP television and publicly stated the following:

"I have attempted to reach the Chief Justice of the Supreme Court by telephone and have failed. I have, however, taken the liberty of sending a telegram to him and to the other members of the supreme court requesting that we be heard on this matter as early as possible Monday morning."

The attorney general knew that this court would be in session early Monday morning and that the proper procedure would have been to appear before the court at that time and make his request. The conclusion is inescapable that he sent these telegrams to individual members of the court on Sunday for the sole purpose of laying a foundation for his television appearance and that he intended thereby to convey to the public the information that he otherwise could not obtain a prompt hearing. In his television appearance he also said:

"* * * It is my feeling that this order was issued by the court without the benefit of any briefs or arguments by the governmental units affected and I strongly feel that the court, when it hears both sides of the question will quash this writ."

In other statements made over the radio and to the press he also indicated that the court had unfairly issued the temporary order without listening to arguments of the attorney general and the counties affected. While so doing he knew, or as an attorney should have known, that temporary writs of this kind are nearly always issued ex parte—that is, without hearing—and are intended to preserve the situation as it is until a hearing can be had. The order to show cause why a permanent writ should not be issued is an order for a hearing and is intended to give both sides an opportunity to prepare briefs and arguments on the issues involved. If we assume that he is familiar with these elementary principles of law, it is obvious that his public statements were intended to deliberately mislead the public and to again lead them to believe that this court had done something improper and to the detriment of the public, while he, as attorney general, was carrying on the battle against the court for the benefit of the public.

While the acts of the attorney general in this proceeding are of sufficient gravity to warrant formal disciplinary proceedings, we have concluded to limit our action at this time to a severe censure of what he has done. In doing so, we wish to have it understood that in no manner do we condone such action nor will we permit a repetition of it in the future. The attorney general, or any other attorney, must understand that he is subject to established rules of ethical conduct. In order to make sure that there is no repetition, we will retain jurisdiction of this matter for a period of three years, with assurance to all that any repetition of such conduct will bring prompt and effective corrective action.

Murphy, Justice (concurring specially).

While I agree substantially with the statements contained in the majority opinion, I would have preferred if the court had in this instance followed Supreme Court Rule XXI (222 Minn. xxxix), which provides among other things:

"Any complaint concerning professional misconduct on the part of

any member of the bar of the state of Minnesota, or any petition for reinstatement, shall be referred to the Practice of Law Committee of the Minnesota State Bar Association for investigation, disposition and report to this court, by such means and under such rules as said committee may from time to time' promulgate."

Moreover, since this is a proceeding disciplinary in nature, I would have preferred that the usual practice in disciplinary proceedings be followed—namely, that the attorney general be furnished with a bill of complaint setting forth the asserted breaches of conduct and that he be given an opportunity for hearing thereon pursuant to the procedures outlined and approved in State ex rel. Russell v. Ives, 60 Minn. 478, 62 N. W. 831; Ex parte Bradley, 74 U. S. (7 Wall.) 364, 19 L. ed. 214; Savin, Petitioner, 131 U. S. 267, 9 S. Ct. 699, 33 L. ed. 150; Gompers v. Bucks Stove & Range Co. 221 U. S. 418, 31 S. Ct. 492, 55 L. ed. 797, 34 L.R.A. (N.S.) 874; Cooke v. United States, 267 U. S. 517, 45 S. Ct. 390, 69 L. ed. 767; Hovey v. Elliott, 167 U. S. 409, 17 S. Ct. 841, 42 L. ed. 215; In re Oliver, 333 U. S. 257, 68 S. Ct. 499, 92 L. ed. 682; Cammer v. United States, 350 U. S. 399, 76 S. Ct. 456, 100 L. ed. 474.

At the proceeding held May 27, 1959, which was investigatory in nature, the attorney general failed to appear. Robert Mattson, deputy attorney general, appeared in his behalf, and was not permitted to be heard. While I do not challenge the conclusions of my brethren on the court, it is my feeling that the interests of due process would have been better served had we heard whatever mitigating circumstances the attorney general wished to submit, which may have occurred under the emergencies and pressures of the crisis which gave rise to these proceedings.

I further concur with the statements of the majority opinion completely exonerating William B. Randall, George M. Scott, and Robert W. Johnson of any acts which might suggest unethical conduct.